KROGER GROCERY & BAKING COMPANY *v.* MELTON.

4-4387

Opinion delivered January 25, 1937.

*Ingram & Moher, Owens & Ehrman* and *J. M. Mc-Farlane,* for appellants.

*A. G. Meehan* and *John W. Moncrief,* for appellee.

SMITH, J. Appellant owns and, on April 8, 1935, was operating a general grocery store in the city of Stuttgart. Oscar Bayless was in charge of the meat department, and on the morning of the day mentioned sold appellee four pork chops, which appellee carried home and cooked and ate. Appellee contends that the chops had spoiled through the negligence of the grocery company and were unfit for human consumption at the time of their sale to him, and that they made him sick, and that this illness developed into an ulcer of the stomach, which has caused him great pain and much suffering and wholly incapacitated him from performing labor of any kind. He sued and recovered judgment for $20,000 damages, which the trial court found to be excessive and reduced to $12,500.

Having found that the judgment was excessive, the trial court should have granted a new trial for this reason upon the refusal of appellee to enter a remittitur for so much of the judgment as was found to be excessive, which he refused to do and has prayed a cross-appeal from the action of the court in reducing his judgment. *S. & C. Transport Co.* v. *Barnes,* 191 Ark. 205, 85 S. W. (2d) 721.

In the motion for a new trial the eligibility of a juror was questioned, upon which issue the court made the following finding of fact: "I am not going to try this case until the Supreme Court passes on the eligibility of the juror, and, in my opinion, the court is going

to reverse it, as the defendant has shown that the juror was ineligible under the ruling of the Supreme Court.'' Upon reaching the conclusions and upon making the findings recited, the court should have granted the motion for a new trial.

We mention these matters to define the proper practice in such cases, but we do not further review these findings for the reason that the more important question of the sufficiency of the evidence to support any recovery is decisive of the case.

It is earnestly insisted that the testimony does not establish negligence on the part of the grocery company which was the only question raised by the pleadings, or submitted to the jury. Upon this issue the testimony was in part to the following effect. Appellant ordered 13 pounds of fresh pork loin from Armour & Company in Little Rock. The meat had been kept in Armour's cold storage warehouse at a temperature of between 34 and 36 degrees. It and other meat weighing altogether 65 pounds was packed in ice, although the truck itself was not iced or refrigerated, and was sent by truck from Little Rock not later than 8 o'clock on the morning of April 5, and reached Stuttgart about 10 a. m. the same day, and was placed in an ice box or cooler the temperature of which was kept between 36 and 40 degrees. During the day after the store is opened meat is placed in a show case kept at the same temperature. Appellee purchased about 10:30 a. m. on April 8 four chops from the pork loin which had been received April 5. A friend drove him to his home about 13 miles from Stuttgart immediately after his purchase. When he arrived home he found that his wife had cooked and eaten her lunch. He proceeded to fry the chops, all of them, in compound lard. After cooking the chops he ate two of them. He was asked the following questions in regard to the chops, and his answers are copied: ''Q. You saw the pork chops in the store? A. Yes, sir. Q. In their appearance, did there appear to be anything wrong with them? A. No, sir. Q. When you took them out of the wrapper to fry them you handled them yourself? A. Yes, sir.

Q. There was nothing about them that would indicate there was anything wrong with them? A. No, sir. Q. They appeared to you to be good chops? A. Yes, sir. Q. And they looked like good chops? A. Yes, sir. Q. You detected nothing wrong with them in preparing them for your lunch? A. No, sir. Q. They were clean? A. Yes, sir. Q. They looked to you just like any other chops? A. Yes, sir.''

It would appear that appellee was unable to detect anything wrong with the chops after handling, cooking and eating them. Only a microscopic examination would have enabled appellant's salesman to make that discovery. The law imposes no such degree of care upon the dealer. *Great Atlantic & Pacific Tea Co.* v. *Gwilliams,* 191 Ark. 650, 87 S. W. (2d) 581.

Appellee testified that his wife ate one of the chops and stated that it did not have a good taste, after which he also observed that fact.

Much testimony was offered by appellee to the effect that before eating the chops he had been a strong, able-bodied man. He was employed during 1935 and a part of 1934 by the CWA, a federal labor project, and he had other employment. He has been examined by numerous physicians. He was first attended and examined by Dr. H. B. Winters on the afternoon of the day he ate the chops. This witness testified by deposition that he found appellee suffering from extreme prostration, thready pulse, cold perspiring skin, and sub-normal temperature, severe cramps in the stomach, diarrhea, and vomiting, these being the symptoms peculiar to food poisoning. Appellee's wife showed witness the uneaten chop, and it did not smell good to him. No one who saw the chops before they were cooked testified that they smelled or looked bad.

Appellee next saw and was treated by Dr. L. Morgan on July 5, 1935. This doctor expressed the opinion that the symptoms detailed by Dr. Winters were due to toxic poisoning, and that in his opinion appellee's condition was due to that cause. He expressed the opinion that if appellee was suffering from appendicitis it would have

been harmful for him to eat pork chops; and he also expressed the opinion that pork chops were not fit for a white man to eat. He stated positively that "I did not say the pork chops caused the ulcer" of the stomach from which he thought appellee was suffering.

Dr. S. F. Hoge testified as an expert witness, and expressed the opinion that appellee was suffering from ulcerated stomach. There were many causes of ulcers, and eating tainted food was one of them.

Dr. Jerome Levy testified as an expert, and expressed the opinion that appellee was suffering from an ulcer of the stomach. He did not undertake to testify what caused the ulcer, and did not testify that eating pork chops, good or bad, would cause ulcer of the stomach.

More than one of these doctors testifying in appellee's behalf admitted that none of the X-ray pictures which they had made of appellee revealed the presence of an ulcer; but they explained that this was not unusual, but was frequently the case where the ulcers existed.

Appellee was treated by Dr. Strait, who was told by appellee that he had bought chops from appellant and had diarrhea. It was shown also that he vomited and excreted blood. The doctor asked appellee if other members of his family had eaten the chops. Appellee answered that his wife had, and when appellee stated that she had not been made sick the doctor discarded the eating of the chops as the cause of the trouble. Appellee's wife also sued for damages, but the jury returned a verdict against her.

Appellee was examined by Doctors John & John jointly, and their testimony was to the effect that they found, from the history of the case and from their examination of appellee, that he had appendicitis, and they so advised him. It was their opinion that appellee's appendix had ruptured and had drained into the bowels. It was an unusual case, because the appendix had ruptured into the abdomen and into the bowels, instead of the peritonital cavity, and appellee was passing pus through his bowels.

Appellee was subjected to an examination for the purposes of the trial by Dr. Swindler and by Dr. John, Sr., who testified that appellee was not co-operative, and while he submitted to their examination the doctors were told by him that ''I have been told not to tell you anything,'' and it was impossible to make a satisfactory examination.

Dr. Drennen testified that he admitted appellee into his hospital on July 10, 1935, and that he operated on him the following morning for appendicitis. He found that appellee had a ruptured appendix. There was no way of telling how long prior to the operation the rupture had occurred, but must have been prior to the operation to create the condition which witness found in the way of adhesions around both the large and the small intestines. Dr. Drennen made no examination for ulcers at that time, but did later after giving salts and an enema to clear the intestinal tract. Dr. Drennen gave appellee barium at 8:37 a. m., and took the first picture at 8:42 a. m. He took six pictures altogether, the last at 10:37, exactly three hours after the time of giving the meal, and he found no indication of an ulcer, either on the stomach or small intestine.

But if it be said that this conflict in the testimony of the expert witnesses was to be expected—and usually appears—and that the jury had the right to believe those who testified in behalf of appellee and to disregard the conflicting testimony, and to find that appellee was suffering from an ulcer which might have been caused by eating tainted pork chops, the fact remains that appellee's own witnesses did not state this to be a fact. Their testimony established the fact only that the pork chops might have caused the trouble, although it could have been caused otherwise. If we assume that the jury was warranted in finding that appellee's illness was not caused by his ruptured appendix, it remains a question of speculation and conjecture whether the ulcer was caused by eating the tainted chops, even though this was shown to have been possible. But if it were sufficiently shown that appellee's illness was in fact caused by eat-

ing the chops, that fact alone would not entitle him to recover. He must show in addition—as the court correctly charged the jury—that appellant was guilty of negligence in connection with the sale of the chops, that is, failed to use and exercise such care as an ordinarily and reasonably careful grocer would and should have used.

In addition to the testimony hereinabove set out, showing that appellee had a better opportunity than appellant had to discover the condition of the meat, without doing so, testimony was offered which appellee insists explains why he failed to make the discovery. This testimony was to the effect that appellant used, in connection with its meat market, a powder called Frostine, which is used both in general cleansing and in freshening the appearance of meat and in destroying any putrid odor which it might have.

This testimony was given by a former employee of appellant, who had quit appellant's service in February before the sale of the chops in April, and on the same day on which a large sum of money disappeared. He was discharged on his examining trial and the charge against him relating to the disappearance of the money was dismissed by the grand jury. This was a circumstance to be considered by the jury, and not by us, and, assuming that the jury may have credited and believed this witness' testimony, we must give to it its highest probative value.

It was shown also that appellee had been sentenced to a term in the penitentiary upon a plea of guilty to an indictment charging grand larceny; but this circumstance was one to be considered by the jury—and not by us—in weighing his testimony.

The former employee testified that Frostine was kept and used in appellant's store. When asked if appellant used Frostine about its meats, he answered that it did, that all meat shops used it. It was not explained just what kind of a chemical Frostine is, except that its use gives stale meat a fresh appearance and destroys

rancid odors. But there was no testimony to the effect that its use would cause ulceration of the stomach.

The testimony on the part of appellant was that the use of Frostine for any purpose had been forbidden in all stores operated by appellant since 1930, and that the last employee known to have violated that order was discharged for that reason. The testimony of appellant's employees in Stuttgart was to the effect that they had never seen any Frostine about the store and had never known any to be used.

However, if the testimony of the former employee be said to raise an issue of fact on this question, it may also be said that he had left appellant's service two months before the sale of the chops, and he, of course, knew nothing of appellant's practice in this regard since that date or at the time of the sale of the chops.

The attempt was made to show that the display case became warped and defective, and was sent to Little Rock for repair, and, because of the defect, would not keep the meat therein contained properly cooled. This testimony was excluded, however, because the witness could not fix the day when that occurred.

The same witness also testified that ''Sometimes on Saturday night the switch would be pushed off from the ice box and be left off until Monday morning and allowed the ice to get loose from the coils,'' and that the effect of that action would be to make the meat ''soft and soggy.'' If we disregard the testimony of appellant to the effect that this was never done, and that the switch was never turned off except while some employee was present to turn it back on when the box had been defrosted, the fact remains that neither appellee nor any other witness in his behalf testified that the chops which appellee purchased were ''soft or soggy,'' nor was any attempt made to show that proper refrigeration was not afforded while the meat here in question was in appellant's possession.

The liability of the dealer to his customer for damages occasioned by selling tainted food is well settled, and has been frequently enforced. The latest case is one

against the present appellant herein, in which we have this day overruled a petition for rehearing, where we were asked to reverse a judgment awarding damages, but declined to do so. *Kroger Grocer & Baking Company* v. *Turner, ante* p. 227, 100 S. W. (2d) 82. In that case the sale of tainted food was established as a matter of fact, and not as a mere matter of speculation and conjecture. In that case a number of witnesses testified that they became ill after eating sausage purchased from appellant on or about the day of the sale to the plaintiff in that case. There is a total absence of such proof in the instant case. Here the sale was made in the city in which the suit was tried before a jury, and although the record bears every evidence of the case having been prepared with much care and that the case was tried with great skill by attorneys thoroughly familiar with the law of the subject, no witness was called to testify that he had been made sick by eating other portions of the 65-pound shipment of meat of which the pork chops were a part.

There was also testimony that meat in the display case was kept in enamel pans, and that the enamel had been broken off around the edges of the pans and that germs might collect in the places where the enamel had flaked off and be communicated to meat which had been placed in the pans. In opposition to this theory it was shown that the pans were washed daily, and then covered with clean strips of heavy paper. But this is only a theory, as no witness testified that he ever saw bad meat in the pans or in proximity to the pork chops, as was shown in the case of *Great Atlantic & Pacific Tea Co.* v. *Gwilliams, supra.*

This case just cited is one of the cases upon which appellee relies and upon the authority of which an affirmance of the judgment here appealed from is asked. There are points of similarity in the cases, and the law applicable to this case was there declared, and is here reaffirmed. But after a full recitation of the facts, it was there stated that the testimony failed to establish negligence on the part of the dealer, and that mere proof of an injury sustained by eating tainted food was not,

of itself, sufficient proof of negligence to justify a recovery. The judgment in that case was reversed, but the case was not dismissed, as it was thought it might be more fully developed. Upon the retrial, after the remand, additional testimony was offered. What was said to be a missing link in the testimony was supplied. The opinion on the second appeal is reported in 191 Ark. 650, 87 S. W. (2d) 581. This additional testimony established the fact that sausage was sold which the butcher who made the sale admitted was spoiled, and he attempted to excuse his conduct in selling the tainted meat by saying that "Most any meat will spoil in time behind the counter." It was shown also that this spoiled sausage had been touching the cheese which the plaintiff testified had made him sick, and that the same knife was used by the butcher in slicing both the cheese and the sausage. There was no such testimony or other showing of negligence in the instant case.

Appellee seeks to invoke the doctrine of *res ipsa loquitur* to supply the missing link in his testimony. But this doctrine has never been applied where the instrumentality which caused the injury was not in the exclusive control of the defendant at the time of the injury. Many cases to that effect are cited in the brief of appellee. Here the chops alleged to be responsible for appellee's injury were not in the exclusive possession of appellant; on the contrary, they were in the exclusive possession of appellee subsequent to the sale.

The case of *St. Louis I. M. & So. Ry. Co.* v. *Hempfling,* 107 Ark. 476, 156 S. W. 171, has become a leading case, which we have since frequently cited and approved, as to when negligence may be shown as an inference without direct proof as to the act alleged to constitute negligence. A headnote in that case reads as follows: "Negligence that is the proximate cause of an injury, may be shown by circumstantial evidence as well as by direct evidence.

In the body of the opinion in that case, Justice Wood, speaking for the court, quoted with approval from the case of *Settle* v. *St. Louis S. F. Ry. Co.,* 127 Mo. 336,

30 S. W. 125, 48 Am. St. Rep. 633, the following statement of the law applicable to such cases: " 'In actions for damages on account of negligence, plaintiff is bound to prove, not only the negligence, but that it was the cause of the damage. This causal connection must be proved by evidence, as a fact, and not be left to mere speculation and conjecture. The rule does not require, however, that there must be direct proof of the fact itself. This would often be impossible. It will be sufficient if the facts proved are of such a nature, and are so connected and related to each other, that the conclusion therefrom may be fairly inferred.' (Citing cases.) "

Upon a consideration of the testimony in its entirety, which we have viewed in the light most favorable to appellee, as we are required to do, we have reached the conclusion that, even though the pork chops might have caused appellee's illness, a fact which we regard more or less speculative and conjectural, the proof of negligence, which is equally essential to establish a case for the jury, is too speculative and conjectural as to furnish a sufficient basis to support an inference of negligence, and as the case appears to have been fully developed, the judgment will be reversed, and the case dismissed. It is so ordered.

HUMPHREYS and MEHAFFY, JJ., dissent.