AMERICAN REPUBLIC LIFE INSURANCE Co. *v.* PRESSON.

4-9101                                             227 S. W. 2d 969

Opinion delivered March 6, 1950.

*Talley & Owen* and *Robert L. Rogers II*, for appellant.

*Bates, Poe & Bates,* for appellee.

GRIFFIN SMITH, Chief Justice. September 1, 1945, American Republic insured Clyde E. Presson, naming Dovie Presson as beneficiary.[1] The principal sum of $1,250 was payable if death occurred through accidental means. In addition, monthly benefits were due upon proof of disability because of sickness or as a result of accidental injury. Quarterly premiums of $15 were payable in advance. There was no period of grace.

The insured was accidentally shot October 30, 1948, and died from the wound the day it was inflicted. The Company denied liability under the plea that the policy lapsed March 10, 1948, when the period for which a payment made the preceding December expired. Appellee prevailed on her proof that unpaid disability claims in respect of which the Company had notice were sufficient to carry the policy to the insured's death. Under appellee's theory the funds wrongfully withheld should have been applied to the quarterly premiums due the 10th of March, June, and September. If the illness alleged existed and the Company had notice in a manner substantially complying with policy requirements, the benefits were sufficient to pay the premiums.

Appellant's summation of the appeal is stated as follows: (a) The Company's check or draft, for $81.48, dated December 30, 1947, and cashed a month later, compensated disability from October 6 to November 1;[2] (b) competent proof did not show that Presson filed a claim

---

[1] The policy bore the indorsement, "Initial term expires December 10, 1945."

[2] The Company's audit covering the illness disclosed an allowance of $46.62 from Oct. 6 to Oct. 20, "confining" disability at $3.33 per day; Oct. 20 to Nov. 1, non-confining disability at $1.66 per day, $19.92; Oct. 6 to Nov. 14, additional hospital allowance, 9 days at $1.66 per day, $14.92; total, $81.48.

after November 1, and the Court erred in permitting Mrs. Presson to testify regarding correspondence; (c) indorsement of the check created an estoppel, and the plaintiff could not go behind the decedent's signature acknowledging payment; (d) the draft constituted full payment; (e) even if the plaintiff be permitted to question complete payment, there was failure to comply with a policy provision that notice of disability must be given within ten days.

Appellee says there is substantial testimony to show that the compensable illness began July 1, 1947, and continued until the first of November. From October 6th to the 14th Presson was in a hospital. He returned home on the 14th and was ill until November 11. According to at least one of the witnesses, the insured went to his place of business and possibly did some light work the first week in November, but got wet, suffered a relapse, and was bedridden until the third week in December.

On defendant's motion proof of disability between July 1 and October 6th was rejected because the plaintiff, prior to trial, had not demanded production of the claimant's original letters or notices of disability; nor, said the Court, could the plaintiff prevail on a claim covering the period in question without showing compliance with the policy provision excluding payment for any period greater than ten days before notice. These rulings were not appealed from.

The certificate executed by Dr. E. J. Brown gave July 1 as the beginning of Presson's illness and November 1 as the termination. Dr. Geo. Holitik, who also treated Presson, certified to substantially the facts covered by Dr. Brown.

Mrs. Elizabeth Pittard, claims auditor for the Insurance Company, testified that under this proof Presson would have been entitled to compensation from July 1 to November 1 at the rate of $3.33 per day "if he had notified us".[3] She explained that failure of the insured

---

[3] This would have amounted to $406.26. However, the answer does not take into consideration the 60-day limitation on payments provided

to give the contractual notice "deprived us of the right of finding out [what his actual condition was"].

When the Court ruled that the claim covering illness prior to November 1 could not be considered, plaintiff's counsel argued that notice of illness subsequent to November 1 had been given and that the amount due under this claim was sufficient to keep the policy in force.

The discrepancies and inconsistencies affecting notice, proof, and the period covered by payment cannot be harmonized. Dr. Brown's certificate was dated November 4th. It was "notarized" December 5. Presson's disability, it stated, began July 1. Dr. Holitik died before the trial began.

A Company letter of October 10 acknowledged receipt of Presson's request for claim blanks, but explained that they were not being sent because the insured did not say whether his disability was caused by illness or accident. The letter did not mention the date of Presson's communication. Four days later the Company wrote that "in accordance with [your] request" claim forms were being enclosed. Nothing was said respecting the Company's objection of October 10,[4] but on November 17 the Company wrote its acknowledgment of Presson's "completed claim blanks". There was the observation that "improper blanks were mailed to you". Another set of forms was enclosed, together with an additional physician's blank; for [wrote the Company] "We note that you had two attending physicians".

Appellee's testimony was that "prior to this the Company sent back some more forms". These were for use in certifying the time claimant had spent in a hospital. Drs. Holitik and Brown "filled out forms, too,

for in Part H of the policy, nor does it differentiate between the classes of compensable liability.

[After Mrs. Pittard had stated that the physicians' certificates disclosed the illness that was being discussed, counsel for appellee said: "In other words, what you are telling this jury is that you knew [the insured] had a disability, but you were depriving him of those benefits because he had not notified you?" The answer was, "That is right"].

[4] Mrs. Pittard, for the Company, testified that the October 10th letter was returned with the word "illness" written on it twice.

and just a few days after this, . . . notice of the relapse the insured had suffered was sent; asked for blanks [for that purpose], but didn't receive any". Appellee was quite certain that the letter of November 17 dealt with the claim her husband had made for the initial phase of the relapse period.

On the fifteenth of December the Company wrote again, stating that it had received claim forms "relative to your illness". There was the assurance that the matter would receive attention "as soon as routine investigations are completed".

On cross-examination Mrs. Presson again mentioned that the claim referred to in the Company's letter of the 17th was for November. A letter requesting forms for use in December was likewise written and posted, but the Company ignored it.

The trial judge, in an attempt to clarify Mrs. Presson's testimony, said: "When [your husband] wrote for the claims in November, they sent *those* to him and he filled them out—is that true?" The answer was, "Yes, sir". Immediately preceding this question Judge Wood had said: "*This* is what Dr. Holitik says here, but I understand you to say that Mr. Presson filed a request for blanks for November, and also for December, and did not get them—did he do that?" Answer: "He did not get any answer."

Mrs. Pittard, as auditor for the Company, was handed an undated letter from the insured in which he wrote, "Please send me blanks to make my claim". She testified that the insurance files disclosed an envelope postmarked at Waldron October 9th, 1947. It was her understanding that the undated letter came in the envelope and that the Company's letter of October 10 was the reply; "but," said the witness, "I can't swear that the letter came out of that envelope".[5]

There was nothing on the check of December 30th showing what period of illness the remittance covered.

---

[5] Mrs. Pittard's refreshing frankness as a witness is of a highly commendable character.

With the record in this condition, the jury could have reasoned that Dr. Brown's certificate of November 4th was returned by the insurer for a formal acknowledgment (as shown by the December 5th dating); that following its second receipt by the Company nearly a month passed before the draft was written, and that perhaps it was retained in the insurance files for several weeks. Mrs. Pittard spoke of signing it, but did not mention the time of mailing. Since it was not cashed until January 31, 1948, there was an unexplained hiatus. In the meantime notices of disability continuing through November and into December had—according to Mrs. Presson—been sent the Company, with a request for blank forms that were not sent.

The policy does not require as a condition precedent to the validity of a claim that *proof* be submitted, although the claim will not be paid until that is done. Written *notice* is sufficient. It then becomes the Company's duty (§§ 3 and 4, General Provisions) to furnish the forms for proof purposes. Result here is that if the notices were actually sent, and there was failure to supply the forms, the claimant was excused in respect of other delays while that status continued.

It is true that the only evidence that notice was given came through Mrs. Presson, an interested party whose testimony will not be treated as undisputed. But the fact-finders chose to accept Mrs. Presson's statements, and the result must stand unless physical facts contradict her or unless the matters testified to are so visionary that it can be said as a matter of law that the statements would not be credited by any reasonable person. For the same reasons Mrs. Presson's testimony regarding the nature, extent, and disabling effect of her husband's sickness after November 1st supports a finding that the compensation withheld was sufficient to pay the three quarterly installments aggregating $45.

Summation of the appeal includes a contention that "Appellee would have this Court believe that [letters were written] asking for blanks, that the blanks were sent in, and that all of these just vanished into thin air at appellant's doing".

That is not the point. "This Court" is not permitted to project the result on what it believes or disbelieves when substantial testimony has been accepted by the jury.

Final argument is that Mrs. Presson ought not to have been allowed to testify that she saw her husband write the November and December letters, and that they were posted. We are cited to the opinion of April 25, 1949, and our action in reversing an insurance judgment and remanding the cause because the insured's wife was permitted to read from carbon copies of letters she allegedly had written to two Companies. *Continental Casualty Company* v. *Speer*, 219 S. W. 2d 763, 215 Ark. 174.

The principles are dissimilar and so are the facts. In the Speer case depositions had been taken with an opportunity to cross, and there was no intimation in any question or answer that the insured received replies to his originals and that these Company letters had been lost when fire destroyed the insured's residence, but that the copies were preserved. The insurer was placed at a prejudicial disadvantage when, without notice, the copies were offered in circumstances where it could not be heard in denial or explanation. The defendant pleaded surprise and requested reasonable time for communication with the home office, no competent witness being present. The motion was overruled. In holding that a continuance should have been granted we said that reasonable foresight did not require the defendant to anticipate that an issue not raised by the pleadings and not hinted at in the interrogatories would be added.

In the case here Mrs. Presson did not read from letter copies, nor did she testify that the defendant had written letters, or communicated by writing in other form, and that the primary evidence had been lost—as did Mrs. Speer. Mrs. Presson's statements were in support of facts within her own knowledge: her husband had written letters, she read what he said, and she knew that the letters had been mailed. Under plain terms of the policy liability could not be incurred in the absence of notice.

Affirmed.