DAVID TURNER v. WILLIAM O. ROSEWARREN, ET AL

5-4883                                          440 S.W. 2d 769

Opinion Delivered May 5, 1969
[Supplemental opinion on Rehearing delivered June 9, 1969, p. 1301.]

*Irwin & Street* and *Edgar Woolsey* for appellant.

*J. Marvin Holiman* for appellees.

CARLETON HARRIS, Chief Justice.    This is a guest liability case.    On October 22, 1966, Betty Rosewarren was a passenger in a car driven by David Turner, appellant herein, the young people being out on a date. Approximately three miles north of Clarksville on State Highway 103, Turner lost control of the car, and collided with a vehicle belonging to Rosa Smith, Miss Rosewarren receiving severe injuries.    Thereafter, William O. Rosewarren, as father and next friend of Betty, instituted suit against Turner in the Circuit Court of Johnson County, alleging injuries to his daughter, and asserting that Turner was guilty of willful and wanton negligence in the operation of his automobile, same being the proximate cause of the injuries to Betty.    The

case was tried on October 21, 1968. At the conclusion of the testimony on behalf of Miss Rosewarren, appellant moved for a directed verdict, the motion being denied by the court. No evidence was offered on behalf of Turner, and appellant again moved for a directed verdict, the motion again being overruled. Nine of the twelve jurors returned a verdict in favor of appellee in the sum of $15,000.00, and from the judgment so entered, appellant brings this appeal. For reversal, it is simply asserted that the evidence was insufficient on the question of willful and wanton misconduct of Turner to warrant submission of the case to the jury.

The evidence relied upon by appellee to establish willful and wanton operation of the Turner automobile is as follows:

Mrs. Helen Stewart, who lives near Clarksville, testified that, on the night of October 22, 1966, she drove north on Highway 103 for the purpose of going to the Woodland Church on Harmony Road, where a Halloween party was being held. Her children were in the automobile with her. When she reached Harmony Road, a point at which she would, if continuing on, start the ascent of a hill, she signaled a left hand turn, and about the same time an automobile, traveling south, came over the crest of the hill.

"We were almost to the turnoff when a car come over the hill pretty fast, and I taken the shoulder of the road to keep it from hitting me. It was weaving."

She was unable to estimate the speed of the approaching vehicle, but said, "It wasn't holding the line —his line. Well, it was sort of taking the yellow line every once in a while." Mrs. Stewart said she moved over partly to the shoulder of the road to avoid any possibility of being hit. The witness made her turn, went on to the church, and did not know of the occurrence of an accident until sometime later.

Her daughter, Karen, testified that the car came over the hill as they were getting ready to turn off of Highway 103, and that "it was going pretty fast." When asked what was meant by the expression, she replied, "Oh, around 85 or 80 or something."

Rosa Smith, sister-in-law of Mrs. Stewart, was also traveling the same route for the purpose of attending the Halloween party. Her three children were in a station wagon with her, and she was behind Mrs. Stewart, a car driven by Mrs. Lula Baker being between the Stewart and Smith vehicles. Mrs. Smith described events, as follows:

"Well, I was taking my children—I have three —to church that night. They were having a Halloween party, and we was going out the Harmony highway, and just before we got to the turning off place my sister-in-law was in front of me, and there was a car following her, and I was quite a ways back, and just as she turned her flicker lights on, this other car—he come around—you know—she passed him, and it looked like the car almost run into the back of that other car—

"Q. Do you know who was in the car behind your sister-in-law?

"A. They said it was a Mrs. Baker. And this car come right straight at me in my lane until he got almost down to me, and when he started in my lane I throwed on my brakes and stopped so he could have time to get back over on his side of the road, and just before he got to me he got over on his side of the road, and it looked like he straightened up, and then he lost control and come right straight over in front of me and slid sideways, just like he was on ice, right into the front of my car."

Mrs. Smith said that the car was going "about as fast as it could go * * * going about 80, I imagine." She said the car was traveling "almost that fast" when her station wagon was struck.

Debbra Smith, 15 years of age, riding with her mother, testified that she was unable to estimate the speed of the Turner vehicle. This was all of the evidence relating to the wreck itself.

In addition, Mrs. Ruth Rosewarren, Betty's mother, testified that, at the Clarksville hospital that night, she asked David what happened, and he replied, "I don't know. I guess I'm not a very good driver." Betty's father, William Rosewarren, said that David told him, "I guess it's my fault, I'm not a very good driver." Mrs. Jewell Phillips, employed at the hospital as a nurse at the time, testified that, as she was pushing David on a stretcher around to the suture table, Betty raised up, looked at David, and said, "Oh—no, no. I told you you couldn't make it." She said that David made no answer, but stated she was not qualified to say whether he was physically able to do so. Mrs. Phillips also said that she was not qualified to state whether Betty was in shock, nor would she say that the young woman was conscious. "She was screaming. She was screaming each word she said, and she was screaming constantly. She was being sutured under local anesthetic."

Betty, 18 years of age, testified with unusual and commendable frankness. With the exception of one fact, hereafter mentioned, she said that she did not remember anything that happened immediately before the accident and she only remembered that immediately after the collision, she heard screams, and suddenly realized that she was the person screaming. The witness said that she and David had been dating for about a year, and that, on the night of October 22, they were on their way to Clarksville, though they had not decided what they

were going to do. She stated that David was not drinking, and all she remembered about the accident was seeing lights. "It felt like the lights were right against my face, and I shoved my hand up like this, against the windshield, to shield my face." She remembered nothing after being blinded by the lights, and was not able to say whether David was driving fast or slow, or why he lost control of the car. Subsequently, on redirect examination by her own attorney, she testified that David was a good driver, and had always been a good driver prior to this occasion; that there had been times when she had called him down for speeding, but he always slowed the car when she requested it. "I never had to call him down very often. He never drove that fast." She said that she was always frightened in an automobile that was being driven fast; that David knew of this fear, and that he always honored her on that point; further, it had never been necessary to call him down for "showing off" in a car.

We think the evidence falls short of establishing willful and wanton negligence. It has been pointed out by this court that, whether an automobile is being operated in such a manner as to amount to wanton and willful conduct in disregard of the rights of others, must be determined by the facts and circumstances of each particular case. *Splawn, Admx.* v. *Wright,* 198 Ark. 197, 128 S.W. 2d 248.

Appellee relies upon four cases, which we will discuss, but it might be here stated that we do not consider that any are authority for affirmance of the present judgment. The first is *Cooper* v. *Chapman,* 226 Ark. 331, 289 S.W. 2d 686. There, the evidence showed that Cooper was driving 100 miles per hour, and Cooper admitted that one of his passengers, Mrs. Chaplain, told him he was "flying too low without wings." Though stating that he did not know that he was traveling over 100 miles per hour at the time, Cooper did say that the car would go that fast, and that he had driven it at 115

miles per hour. There was testimony that all passengers importuned Cooper to slow down. Certainly, that case is distinguishable from the instant litigation.

In *Tiner* v. *Tiner,* 238 Ark. 222, 379 S.W. 2d 425, where four children were killed, and other persons severely injured, the evidence as to willful and wanton negligence of Berlin Tiner reflected that Tiner himself stated that shortly before the collision there began a torrential rain; that he went into the rain as a "sheet or wall of rain;" that his car skidded and "fish-tailed" on the slick asphalt road, so much so that the rear of the automobile was in front of the motor, and that visibility during this "sheet or wall of rain" was practically nil. A witness testified that the Tiner car entered the rain at a speed of 80 miles per hour, and there was no lessening of that speed up to the time of the collision. There was also evidence that Tiner had said that he could have gone to the ditch on the road on his right side, but did not want to damage his car.

In *Harkrider* v. *Cox,* 230 Ark. 155, 321 S.W. 2d 226, appellant's automobile (a young lady being a guest in the car) was traveling at a speed of 45 miles per hour on a heavily traveled highway at a time when visibility due to fog was not more than 50 to 100 feet; nonetheless, Harkrider proceeded to try and pass a cattle truck, and was hit head on by an oncoming automobile.

In *Henshaw* v. *Henderson,* 235 Ark. 130, 359 S.W. 2d 436, there was not only evidence of speed at 80 miles per hour, but evidence that the driver was drinking. In fact, one of the young ladies in the car testified that, when she left her premises to go to his car, "he kinda stumbled once."

So—in *Cooper,* passengers were begging the driver to slow down, and Cooper admittedly had driven his automobile at high speeds on other occasions; also, it was established that the reason Cooper lost control of

his car was the terrific speed.    Here, Turner's prior driving record was good, nor is there any evidence that anyone asked him to slow down; nor is it established that Turner lost control of the car *because of willfully moving at a high speed*.    It will be noted that the other three cases all included factors that contributed to the finding of willful and wanton driving in addition to speed.    In *Tiner*, there was a "wall of rain," with practically no visibility.    *Harkrider*, involving the effort to pass a vehicle in a dense fog, speaks for itself. And in *Henshaw*, there was evidence of drinking.

Let us summarize the evidence in this case.    In the first place, there is *no testimony* with regard to what caused Turner to lose control of his car.    The automobile was apparently out of control at the time the first witness viewed it.    Was it because of negligent driving?    Failure of brakes?    Other mechanical defect? Could he have been blinded by the lights of the oncoming cars?    This last has some support in the testimony of Miss Rosewarren.    The evidence of this young lady, who had been dating appellant for about a year, and seemed entirely familiar with his driving habits, does not indicate appellant to be a driver who deliberately, intentionally, or wantonly, on October 22, performed acts that he should have known would likely result in danger to his passenger.    While appellee's witnesses (Mrs. Smith and Miss Stewart) were likely completely sincere in their estimate of Turner's speed as 80 or 85 miles per hour, physical facts do not indicate this to be true.    A photograph of the Smith car is in the record, and it certainly does not appear, from the amount of damage shown, that the Smith vehicle was struck with that much force.    The proof also shows that the windshield of the Smith car was not broken, and, though seat belts were not being used, no one was thrown from the station wagon.    We find no significance in David's remark that he guessed he wasn't a good driver.    Here was a young man, depressed and distracted, because of the injuries to his friend, as well as to himself, who

might well have felt blame because he was the driver of the car. At any rate, there are numerous persons who would not be considered good drivers, but who, nonetheless, do not drive willfully or wantonly—just incompetently.

Nor do we find great significance, under the circumstances, in the remark made by Betty as she was rolled through the hospital screaming, very likely in shock. The comment would mean but little, even if it were known that she referred to some particular circumstance. David's failure to answer his friend, screaming with pain, likewise establishes nothing, even if he were fully aware of what she had said.

Basically, because there is no showing of why the Turner automobile went out of control, we think the evidence falls short of establishing the requisite degree of negligence.

Reversed and dismissed.