DAVID TURNER *v.* WILLIAM O. ROSEWARREN ET AL

5-5444                                                    464 S. W. 2d 569

## Opinion delivered March 8, 1971
[Rehearing denied April 12, 1971.]

*Irwin, Streett & Branden,* for appellant.

*J. Marvin Holman* and *William M. Stocks,* for appellees.

JOHN A. FOGLEMAN, Justice. This appeal comes from a judgment after a new trial of appellees' action to recover from appellant, Betty Rosewarren's host automobile driver, for personal injuries, following our reversal of the first judgment in *Turner* v. *Rosewarren,* 247 Ark. 1301, 440 S. W. 2d 769. We then reversed because the evidence was not sufficient to show wilful and wanton misconduct on the part of appellant. After the first judgment, Betty and appellant were married, the cause was remanded, new witnesses were discovered, Betty's impaired memory was improved and the cause again submitted to a jury which returned a verdict for a substantially larger amount than did the first jury. Appellant again urges that the evidence was insufficient to support a verdict finding him guilty of wilful and wanton misconduct. On this appeal he also asserts that the trial court erred in admitting the testimony of Helen Stewart, who testified at the first trial, and of Mrs. David Scott, who did not. We are unable to agree with appellant on either point.

No useful purpose would be served by reiterating evidence common to both trials. We will endeavor to give emphasis to testimony at the second trial not given in the first one. We find the additional evidence sufficient to leave the question of wilfulness and wantonness of appellant's conduct to the jury and its answer dependent almost entirely upon the credibility of witnesses.

Betty Rosewarren's recovery from traumatic amnesia commenced one or two years after the collision. It was not complete, either as to events recalled or clarity of recollection of those things she did remember. Facts she did recall were significant, however. She remembered that appellant David Turner was angry with her before

the collision, and had intentions of breaking off their relationship and recovering his class ring. Still, she could not remember his coming to her home, but could remember his driving down the road and her being frightened by the bright lights of a car coming up very close behind the Valiant automobile driven by Turner and in which she was riding. She remembered that David told her Kenny Elkins was driving that car. She then remembered seeing a speedometer reading "85 miles an hour" and turning to look at David, but couldn't recall whether she actually saw him. While she incorrectly described the shape of the speedometer she envisioned, she explained, after a recess, that she was confused and had incorrectly described the shape of the speedometer on her father's automobile instead of that which she recalled seeing in David's car. She admitted that she really could not say when she saw the 85-per-hour reading except that it was after a car approached from the rear of Turner's vehicle. After she looked toward David, all went black, she said, until suddenly a light in the window and across the windshield on her side struck her in the face. It seemed to her that Turner's car was sliding toward the lights. She remembered hearing screams which were her own and feeling as if there was nothing of her below the waist. She recalled asking for David, hearing Kenny Elkins' name, and later asking David while in the ambulance en route to the hospital why he was angry and why he wouldn't talk.

Betty also told the jury that David had driven past the place where the collision occurred many times over a period of more than one year immediately preceding this occasion. She said that, at the place of the occurrence, a driver comes upon a hill at the bottom of which there is a curve where the highway is rough and will "throw" a car which enters it. According to Mrs. Turner her fear of speed causes her to "freeze" or "clam up" until it is over. David had previously told her, she testified, that his Valiant was light and hard to handle at high speeds. She also revealed that her husband had a temper.

Other pertinent new testimony was that of Arkansas

State Police Trooper Eldon Brown and Mr. and Mrs. David Scott. Brown investigated the collision on the night it occurred. He arrived at the scene while Betty and David were still there. Brown could tell then that appellant had lost control of his 1962 Valiant while coming around the curve, crossed the center line and struck the 1961 station wagon driven by Mrs. Rosa Smith. Brown described the highway at the point as "wavy" pavement 20 feet wide, with a dip and a raised place in the curve. North of the curve there is a hill and a sign 1,000 feet north of the dip warning of the impending curve. Brown said that the "dip" and the "hump" will cause the right side of a vehicle rounding it to be thrown upward and the vehicle itself leftward. He located the point of impact south of the curve. He found the Turner and Smith vehicles at a distance of 283 feet from the dip. He had recorded this distance as 183 feet on his official report, but had discovered his 100-foot error while remeasuring the distance three weeks before the trial at the request of appellees' attorney. Brown could tell that the wheels of the Valiant had dropped off the pavement just south of the dip, after which the vehicle traveled about one-half the distance to the point of impact, came back on the highway, skidding sideways out of control across the center line, laying down 141 feet of skid marks, and then collided with the station wagon. Brown said that the damage to the Valiant was heavy and to the station wagon considerable.

David Scott lived in a house about 200 yards southwest of the point of the collision. He described the curve as a blind one on an 18-foot wide, low-type asphalt and rock highway without any shoulders whatever. He knew of a low spot in the approach to the curve from the north, which would cause a car passing over it to lurch. He heard the impact on the night of the wreck, went to the scene and then summoned the ambulance and state policeman. He observed skid marks of the Turner vehicle in the ditch west of the highway and then across the highway into the ditch on the east side where he found the vehicle at rest. The marks of only two wheels appeared in the ditch.

Mrs. David Scott heard a thump, then heard and saw the impact. She went immediately to the Turner car where she found Betty Rosewarren lying in the car on the right side. It was dark at the time, and she did not know David Turner. She saw a boy go around, get hold of the steering wheel and take something out of the car. There were only two people beside her at the scene when she got there—Betty Rosewarren and a boy. She testified that when she first saw the boy he was coming out of the car from the driver's side. She did not know him and was unable to identify him. She testified that this boy helped her open the door on Betty's side of the car and then squatted down beside Betty. While he was in that position, according to Mrs. Scott, he said "I was racing." Mrs. Scott saw another boy come up just a few seconds later, and other people came later. She said that a number of people were present when this boy made the remark about racing.

Helen Stewart again testified. She said that her sister-in-law, Rosa Smith, was following her to the Hallowe'en party at the Woodland Church. She estimated the distance to the church from the place where the wreck occurred as one-quarter of a mile. One proceeding north past the scene of the wreck, as she was, would make a left turn at the top of the hill north of the curve. Unlike her earlier testimony, she testified that as she was ascending the hill in her automobile, when she was close to her turn and had given her turn signal, she met "these fast *cars*"[1] going back and forth across the center line, causing her to pull onto the shoulder of the road until they had passed. She then said that the *car*[1] she met was moving so fast it was not holding the road, and was moving back and forth across the center line where the road was "curvy." The failure of this vehicle to remain on its proper side of the highway caused her to leave the highway to get out of its way. She recalled that two or three cars were following her at the time.

Mr. William Rosewarren, Betty's father and one of the appellees, testified this time that appellant's remark

[1] Emphasis supplied.

to him at the hospital was, "Mr. Rosewarren, I guess I'm not a very good driver. I was driving too fast. It's all my fault." He also described the highway at and near the place of the collision. He called it a wobbly, weaving, blacktopped, narrow road. He described the hump on the approach to the curve as one which caused a vehicle to "drop down and up." He also said that anyone who drove that road knew that 50 miles per hour was the maximum speed at which a vehicle could make the curve. He questioned the accuracy of the record as to his previous testimony about David's remark to him. He also claimed that, having never been in a courtroom before, he was in fear at the first trial.

Kenny Elkins was called as a witness by appellant. He said that he had known appellant in high school and Betty Rosewarren for six or seven years. He was stopped at an entrance to the highway when he saw them pass just before the collision. He pulled onto the highway directly behind them at a point about three miles from the place the wreck occurred. He said he was following them at a distance of six or seven car lengths and at a speed of 55 to 60 miles per hour with no vehicle intervening. He said that he did not see the wreck because the vehicles were out of his line of vision around a curve. Elkins said that they were meeting cars and that the third one, the vehicle immediately preceding that of Rosa Smith, never dimmed its bright lights. When he went around the curve the first thing he saw was the back end of David's car up in the air coming down. He stopped before he reached the actual point of impact. He saw no car on the shoulder, as he approached, and did not see a left turn blinker signal given by any car he met near the intersection with the road to Woodland Church. He denied ever trying to pass the Turner vehicle. He claimed to have been the first person to go to the scene, but having stopped in such a position that his vehicle blocked the highway, he went back to clear the highway. He said that he got David out of the car and at about the same time told Scott to call the police and the ambulance. He remembered seeing Mr. Scott's mother but did not see Mrs. David (Margaret) Scott at

the scene. He said it was he who squatted down beside Betty and talked to her.

Appellant contends that the testimony of Helen Stewart should have been excluded because she did not identify him as the driver of the vehicle whose actions she described. He also argues that Rosa Smith's testimony did not connect him with that vehicle. We agree that Mrs. Stewart did not identify the vehicle or the driver. Rosa Smith did not testify, but her testimony at the earlier trial was read. She said that, just as Mrs. Stewart turned on her blinker light before turning off the highway, she met a vehicle coming over the hill that almost struck the back end of the Baker vehicle just behind Mrs. Stewart and seemed to head directly toward her vehicle quite a ways back. She testified that the vehicle then seemed to swerve back on the right side of the road and straighten up, but then went off the shoulder of the road, then came back up on the road and skidded right in front of her. She said that the car that hit her was the only one going south at the time. This testimony of Rosa Smith tended to connect the Turner vehicle with the Stewart testimony sufficiently to prevent the failure to exclude it from constituting error.

Appellant's argument as to Mrs. Scott's testimony is based upon her inability to identify the driver of the Valiant or the one making the statement about racing, its contradiction by Elkins, and the failure of appellees to make Elkins a party defendant or to call him as a witness. We think that it would not be unreasonable to draw the inference that the person Mrs. Scott described was the driver of that vehicle, if her testimony was believed. Admittedly, this driver was David Turner. Appellant's arguments really attack the credibility of the witness and the weight to be given to her testimony, rather than its admissibility. Failure to exclude her testimony was not error.

The more difficult question is the sufficiency of the evidence to support the verdict. We have concluded, however, that fair-minded men might reasonably conclude

from the evidence that David Turner, in a display of temper, while driving at an extremely high speed, in order to frighten the passenger at whom his fit of anger was directed, entered into a curve well known by him to be unusually dangerous for high speed vehicles because of the "dip" "hump" and lack of shoulders, fully appreciating the fact that his conduct would probably result in injury, in utter disregard of the consequences. The jury might even have found that he was racing with, or trying to keep ahead of, Kenny Elkins. While we must necessarily resolve the question of sufficiency of the evidence to present the issue of wilful and wanton misconduct upon the facts and circumstances of the particular case, this case is closely analogous to the situation presented in *McCall* v. *Liberty*, (April 27, 1970), 453 S. W. 2d 24, where we found substantial evidentiary support. It is true that we have no evidence of drinking alcoholic beverages here. Either appellant's anger or his racing would be an equivalent circumstance to show an attitude of arrogant or heedless recklessness.

The serious questions raised here really relate to the credibility of the witnesses rather than to the substantiality of the evidence if the testimony is believed. We are unable to say that the testimony was so incredible that it must be held to be insubstantial. In this respect, we must leave evaluation of the credibility to the jury and not upset its findings unless we can say that there is no reasonable probability in favor of appellees' version, and then only after giving legitimate effect to the presumption favoring the jury findings. *McWilliams* v. *R. & T. Transport, Inc.*, 245 Ark. 882, 435 S. W. 2d 98. *Fidelity-Phenix Ins. Co.* v. *Lynch*, (June 8, 1970), 455 S. W. 2d 79. Whatever doubt may be cast upon the testimony of the appellees and their supporting witnesses was to be resolved by the jury and cannot be considered by us. *Arkansas Power & Light Co.* v. *Kennedy*, 189 Ark. 95, 70 S. W. 2d 506. We must give testimony credited and believed by the jury its highest probative value. *Kroger Grocery & Baking Co.* v. *Melton*, 193 Ark. 494, 102 S. W. 2d 859; *Arkansas Power & Light Co.* v. *Kennedy*, supra. We cannot disregard testimony believed by the fact finder, but are bound by it unless it is so

contrary to physical facts or laws, scientific knowledge, laws of mathematics, or daily experience of common life or is so visionary that we can say as a matter of law that it could not be credited by any reasonable person. *Standard Oil Co. of Louisiana* v. *Hodges,* 193 Ark. 899, 103 S. W. 2d 927; *Alldread* v. *Mills,* 211 Ark. 99, 199 S. W. 2d 571; *Lanier* v. *Trammell,* 207 Ark. 372; 180 S. W. 2d 818; *American Republic Life Ins. Co.* v. *Presson,* 216 Ark. 771, 227 S. W. 2d 969. See also *Corn* v. *Ark. Warehouse,* 243 Ark. 130, 419 S. W. 2d 316. Since we cannot say that the testimony in this case is so contradicted or so visionary, we must affirm the judgment.