Barbara BROWN, Administratrix of the Estate of Robert Mark Brown, et al., Plaintiffs,

v.

MISSOURI PACIFIC RAILROAD, Defendant.

Civ. No. 80–4027.

United States District Court, W. D. Arkansas, Texarkana Division.

July 12, 1982.

Phillip H. McMath, McMath, Leatherman & Vehik, Little Rock, Ark., for plaintiffs.

James M. Simpson, Friday, Eldredge & Clark, Little Rock, Ark., for defendant.

MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

### Introduction

This action originates under 28 U.S.C. § 1332, pursuant to Ark.Stat.Ann. § 27–906. Barbara Brown initiated this wrongful death claim as administratrix of the estate of Robert Mark Brown, her deceased son, seeking compensatory and punitive damages on behalf of the estate and the parents and siblings of the deceased. Complete diversity of citizenship is present and the amount in controversy exceeds $10,000.00 exclusive of interest and costs.

The matters before the Court are defendant's motions for judgment *non obstante verdicto* and for a new trial.

This action arose from a car/train collision which occurred at the intersection of one of Missouri Pacific's railroad tracks and Laurel Street in the City of Prescott, Arkansas, on July 22, 1979. Robert Mark Brown was the sole occupant of a pick-up truck which collided with the train. Robert Mark Brown died three weeks subsequent to the accident.

The case was tried to a jury from April 5 to April 8, 1982, in the Texarkana Division of the Western District of Arkansas. The jury awarded compensatory damages totaling $80,000.00 and punitive damages of $62,000.00 to the estate.

The defendant's motions contest the propriety of the Court's submission of the punitive damages issue to the jury.

### Discussion

#### I. Judgment N. O. V.

In passing upon the motion for judgment notwithstanding the verdict, the Court is (1) to consider the evidence in the light most favorable to the plaintiffs; (2) to assume that all conflicts in the evidence were resolved by the jury in favor of the plaintiffs; (3) to assume as proved all facts which plaintiffs' evidence tends to prove; (4) to give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from the facts proved; and (5) to

deny the motion if, reviewing the evidence in this light, reasonable men could differ as to the conclusions to be drawn from it. *Hanson v. Ford Motor Co.*, 278 F.2d 586, 596 (8th Cir. 1960); *Richardson v. Missouri, Pacific R. R. Co.*, 677 F.2d 663 (8th Cir., 1982).

Prior to trial, defendant moved for summary judgment on the issue of punitive damages, based upon the theory that Arkansas law does not allow punitive damages in a wrongful death action. Judge Henry Woods, in an excellent and well-reasoned opinion, laid that argument to rest in *Fields v. Huff*, 510 F.Supp. 238 (E.D.Ark.1981). Accordingly, defendant's motion for summary judgment was denied, and although defendant has not abandoned its position, defendant does not reassert the argument here.

In essence, defendant contends that even if punitive damages are recoverable in a wrongful death action, there was not sufficient evidence from which the jury could find punitive damages appropriate. Thus defendant argues that it was error for the Court to submit the punitive damages issue to the jury and that the Court should have directed a verdict for the defendant on this point.

Before punitive damages may be imposed, it must appear that the defendant knew or had reason to believe that its course of conduct was about to inflict injury and that it continued in its course with a conscious indifference to the consequences. *St. Louis Southwestern Railway Co. v. Evans*, 104 Ark. 89, 148 S.W. 264.

■ Thus, our task is to determine whether there was substantial evidence presented as to whether the defendant knew or had reason to believe that its course of conduct was about to inflict injury and continued in this course with conscious indifference to the consequences. If this proposition is supported with substantial evidence, the jury verdict must stand.

The jury obviously found that the Laurel Street crossing was abnormally dangerous. The case was submitted to the jury on only two theories of liability: (1) that the train

did not sound its bell or whistle as required, and (2) that the crossing was abnormally dangerous and therefore the defendant had a duty to provide a warning system sufficient to allow the traveling public to use the crossing with reasonable safety. Since the jury imposed punitive damages, it must necessarily have found the crossing unreasonably dangerous. It stretches credibility to believe that failure to ring a bell constitutes willful and wanton conduct. Further, there was no evidence adduced tending to show that the defendant formulated a conscious policy of failure to ring the train bell. Obviously then, the jury must have found the Laurel Street crossing unreasonably dangerous, and that defendant failed to do anything in mitigation of the danger although fully aware of it. This is the essence of plaintiffs' theory.

Plaintiffs argue that the defendant railroad made a conscious decision not to provide railroad crossing safety devices at its own expense despite the fact that it had the duty to do so under Arkansas law. Plaintiffs rely upon the "Pinto case" argument: *i.e.*, that defendant took the position that it is cheaper to cause injury than to provide proper safety devices.

The evidence adduced at trial indicated that one other crossing accident occurred at the Laurel Street crossing within the ten-year period preceding this accident.

■ Defendant argues that one and one-half million motorists had safely used this crossing. This is not persuasive. If two cars per minute traversed a crossing, well over a million motorists would use the crossing every year. One fatal accident per year could easily lead one to conclude that an injury was imminent at this hypothetical crossing notwithstanding that the injury was literally "one in a million." Therefore, the simple fact that many motorists had escaped injury at the Laurel Street crossing since the last deaths there does not indicate that the crossing was reasonably safe.

The proof showed that defendant made a conscious decision not to provide railroad crossing safety devices despite its duty to do so under Arkansas law.

■ Defendant's duty to provide the safety devices depends on the Laurel Street crossing being unreasonably dangerous.

■ Mr. Thomas Bryant, crossing warning systems engineer for defendant, testified that both the Arkansas and Federal hazard indices are valid predictors of the relative hazards of crossings (R. 64). Mr. Bryant said that train traffic had been between 30 and 47 trains per day at the crossing. The speed limit at the crossing was 50 miles per hour (R. 65). The hazard rating for two other crossings of the same track was high enough that defendant recognized the need for warning devices at these two crossings, and the Laurel Street crossing was hazardous enough for the railroad to recommend closing it (R. 80). Originally the defendant had recommended that the Laurel Street crossing be protected with an active safety device (R. 102). The defendant recognized the obvious—that safety devices make a crossing less dangerous (R. 108).

Mr. Mike Selig, a civil engineer for the Arkansas Highway Department, testified that five factors make up the hazard rating. These are (1) number of vehicles, (2) number of trains, (3) number of tracks, (4) number of accidents, and (5) local conditions (R. 135). The hazard rating for Laurel Street was 20.12 (R. 138). This is in the top ten percent of all crossings in the state of Arkansas (R. 139). The State recommended at least flashing lights and bells at such a crossing, and short-arm gates for double tracks (R. 139), although the Laurel Street crossing was a single track. In any event, it was determined that the Laurel Street crossing posed such a hazard that it should have either been protected or closed (R. 144).

Clearly, the jury had before it sufficient evidence from which it could reasonably conclude that defendant's failure to erect safety devices was "about" to inflict injury on the traveling public.

The defendant draws a distinction between "possibilities" and "probabilities" of injury. This distinction is not unjustified. AMI 301 provides in part:

To constitute negligence an act must be one from which a reasonably careful person would foresee such an appreciable risk of harm to others as to cause him not to do the act, or to do it in a more careful manner.

On the other hand, AMI 2217 provides in part:

Before you can impose punitive damages you must find that ——————————————— knew or ought to have known, in the light of the surrounding circumstances, that his conduct would naturally or probably result in injury and that he continued such conduct in reckless disregard of the consequences from which malice may be inferred.

The substance of defendant's argument is essentially that the categorization of the crossing as unreasonably dangerous does not establish that defendant's failure to erect warnings would naturally or probably result in injury. This is true. However, the question here is not whether one follows from the other, but whether there was sufficient evidence from which the jury could find that the defendant's conduct would probably result in injury.

The facts in question do not deal in possibilities or probabilities but actually deal with the question of certainties. It was established by expert testimony in the case in question that railroad safety devices when utilized at abnormally dangerous crossings can reduce railroad fatalities by a factor of five. That is to say, that they reduce fatalities to one-fifth of their previous total. It is not a question of possibility or even probability but more a question of certainty that absent these devices people will be killed and maimed at these abnormally dangerous crossings. By the railroad's own admission, they knew of these studies, accepted them as valid, and indeed knew that the specific crossing in question, *i.e.*, the Laurel Street crossing, was in the top ten percent of dangerous crossings in the state of Arkansas under the Arkansas Highway Department's formula. Despite this knowledge, the railroad by its own ad-

mission made a policy decision not only not to protect the Laurel Street crossing but not to protect any crossings at its own expense despite its clear duty to do so under the law.

The railroad in the case at bar has, by its own admission, taken the position that it is cheaper to pay compensatory damages than it is to provide proper safety devices and/or slow down their trains in this very dangerous area, which, by their own admission, is one of the most dangerous areas in their territory.

In this case we are dealing with a policy decision consciously arrived at over a period of years by the defendant not to take certain precautions which, under the law, it is required to do. This was done in spite of the evidence that this continued course of conduct would probably result in death or injuries.

The defendant deliberately ceased making new installations of warning devices at its own expense some time back in the 1950s (R. 65, 69). This, despite repeated requests by citizens and the city to do so, and warnings of present danger.

The defendant relied upon a federal funding scheme by which the federal government would pay for ninety percent (90%) of the cost of the devices and the various cities would pay ten percent (10%) of the cost (R. 81). The defendant spent $9,104.00 of their own funds in 1979 in the entire state of Arkansas for installation of equipment. $8,400.00 was spent for installation in 1978 (R. 112). The cost of installation of flashers approximates $40,000.00. Installation of a gate costs approximately $65,000.00 (R. 95). In the years 1977 through 1980 in Arkansas, the defendant spent, of its own funds, approximately $40,000.00—enough to install one set of flashers.

If the law requires railroads to erect sufficient warning devices so as to allow the public to use unreasonably dangerous crossings with a reasonable degree of safety, as it does, *St. Louis Southwestern R. Co. v. Jackson*, 242 Ark. 858, 416 S.W.2d 273 (1967), then the law will not allow a rail-road to sit idly by, knowingly shirking its duties in relentless pursuit of profits.

There was some evidence that train speed and vehicle speed are valid factors to consider in the determination of the safety of a crossing (R. 204). The railroad set a self-imposed speed limit of 50 m.p.h. in Prescott. The railroad, in spite of the dangerous nature of Prescott crossings, chose to travel 50 miles per hour inside the city limits (R. 207), knowing the crossings were unprotected. Mr. Gorman, employee of defendant, allegedly made a statement to the Kiwanis Club at Prescott that crossing gates were not installed because it was cheaper to have the lawsuits than to put up the gates (R. 279). This appears to be true. The compensatory damages awarded herein would purchase perhaps two sets of flashers and perhaps one gate. With the cost of upkeep, it indeed seems to be less expensive for the defendant to pay claims than properly to protect crossings, unless federal and state funding pay for the protection.

It appears that the jury could rationally have concluded that the defendant made a conscious decision not to perform the duties imposed upon it by Arkansas law unless someone else was to pay for it. Such deliberate abandonment of duty in the face of probable injury is sufficient to justify an award of punitive damages under Arkansas law.

The reason train speed and warning devices are crucial is obvious. As stated by Mr. John Peterson, train engineer:

> That's a helpless feeling that an engineer, or anyone in the cab of a locomotive has. You can't deviate from your direction, you are committed. You're on a set of rails, you can't turn the locomotive. Once you apply the brakes in emergency position, that's all you can do, there is nothing left.

(R. 357).

Thus, while train speed is quite often not the proximate cause of a collision, train speed has a great deal to do with the severity of any given collision. Since "all you can do" is apply the brakes and wait half a mile

to stop, the only steps a railroad can take to decrease crossing collisions and fatalities is reduce speed and erect warnings. The defendant did neither despite requests and warnings.

Evidence of defendant's net worth was read into the record at the close of plaintiffs' case. The defendant admitted its net worth to be $762,910,000.00. The jury imposed punitive damages in an amount approximately equal to 1/12,715 of defendant's net worth. The jury seemed to feel this sum should have been spent on new crossing protection devices.

Defendant cites several cases for the proposition that failure to erect warning devices cannot ever constitute willful and wanton conduct. *See Carter v. Peace and Seaboard Air Line Ry.*, 229 S.C. 346, 93 S.E.2d 113 (1956); *Sturdevant v. Erie Lackawanna R. R. Co.*, 319 F.Supp. 732 (W.D.Pa. 1970); *Herglund v. N. Y., Chicago & St. Louis R. R. Co.*, 1 Ill.App.3d 968, 274 N.E.2d 671 (1971); and *Wollaston v. Burlington Northern, Inc.*, 612 P.2d 1277 (Mont.1980).

■ However, Arkansas law is fairly clear in this regard.

It must appear that the negligent party knew, or had reason to believe, that his act of negligence was about to inflict injury, and that he continued in his course with a conscious indifference to the consequences, from which malice may be inferred.

*Evans, supra.*

The record is replete with evidence that the defendant had reason to believe that its failure to erect warning devices and its entire course of conduct with respect to the Laurel Street crossing was about to inflict injury on some member of the traveling public and yet continued in its course of conduct with a conscious indifference to the consequences.

Punitive damages in a crossing case may not often be justified. However, as defendant notes in its brief:

[T]here is no question but that there are cases where the imposition of punitive damages is warranted by the evidence and serves a purpose. Where the evidence shows that the defendant has manifested a policy of conduct so abhorrent that it should be punished, a jury should be allowed to decide whether to assess punitive damages and the amount of those damages.

(Defendant's Post-Trial Brief, p.6).

We think that the jury could rationally have concluded that the defendant manifested a policy of conduct so abhorrent that it should be punished.

■ Since the motion for judgment n.o.v. is denied, Rule 50(c)(1) does not require this Court to rule on defendant's motion for new trial. Nevertheless, a brief discussion is in order.

Defendant argues that the jury should not have heard the broad range of evidence presented by the plaintiffs on the punitive damages issue. Implicit in this argument is that the finding of negligence was "tainted" by the evidence relating to punitive damages.

The jury was instructed as to the burden of proof, and the elements of plaintiffs' claims (AMI 203), negligence was defined (AMI 301, 303), proximate cause was explained (AMI 501), the duties of the railroad were listed (AMI 1801, 1805), and the circumstances under which punitive damages may be imposed made clear (AMI 2217). It must be assumed that the jury understood and followed the instructions. From the instructions as a whole, it was clear to the jury that the state of mind of the defendant was irrelevant unless there was a prior finding of liability based upon negligence on the part of the defendant.

The verdict form carefully segregated the punitive damage element from the compensatory damage element. Compensatory damages for each plaintiff were carefully segregated from one another. It cannot be presumed that the evidence relating to punitive damages affected the award of compensatory damages. There was ample evidence, indeed overwhelming evidence, of negligence on the part of defendant, excluding all evidence relating to punitive

354

damages. No manifest injustice is apparent. The verdict is not against the clear weight of the evidence. No clear errors of law were raised or argued by defendant or plaintiffs in their post-trial motions.

Accordingly, defendant's motion in the alternative for a new trial will be denied.

A separate order in accordance with this memorandum opinion will be concurrently entered.