703 F.2d 1050
 Barbara BROWN, Administratrix of the Estate of Robert Mark
Brown; Herman Brown, Father and Parent of Robert Mark
Brown; Sharon Schaub, Judy Grove, W. Herman Brown, Paula
Brown, Brothers and Sisters of Robert Mark Brown, Appellants,
v.
MISSOURI PACIFIC RAILROAD, Appellee.
 No. 82-1946.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 3, 1983.
Decided April 1, 1983.
 
 Herschel H. Friday & James M. Simpson, Little Rock, Ark., for appellants.
 James Bruce McMath, Little Rock, Ark., for appellee.
 Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.
 ARNOLD, Circuit Judge.
 This case arises out of an accident at a railroad crossing in Prescott, Arkansas. The District Court[1] entered judgment on the jury's verdict, and the railroad appeals. The jury awarded $80,000 compensatory damages and $62,000 punitive damages. Motions for judgment non obstante veredicto and a new trial were filed by the railroad. They were denied. Brown v. Missouri Pacific Railroad, 543 F.Supp. 348 (W.D.Ark.1982). On appeal the railroad argues two points: (1) that there was insufficient evidence of willful or wanton misconduct on its part to warrant an award of punitive damages and (2) that under Arkansas law punitive damages may not be recovered in an action for wrongful death under Ark.Stat.Ann. Sec. 27-906 et seq. (1979).[2] We affirm.
 On July 22, 1979, a Missouri Pacific Railroad train collided with Robert Brown's pickup truck at the Laurel Street crossing in Prescott. Robert, then seventeen, died three weeks later. There is a crossbuck sign at the crossing, but no active protective devices, i.e., flashing lights, bells, or gates.[3] Barbara Brown, the decedent's mother and administratrix of his estate, filed suit. She alleged that the railroad acted negligently and in willful and reckless disregard of the public's safety. She sought compensatory and punitive damages on behalf of the estate and the parents and siblings of the deceased. A four-day jury trial was held. On appeal, the railroad does not challenge the jury's finding of negligence but only the award of punitive damages.
 We hold that the trial court properly denied the railroad's motion for a judgment n.o.v. on the award of punitive damages. Punitive damages may be imposed upon a defendant who knew or had reason to know that its course of conduct was about to inflict injury but who nonetheless continued on this course with a conscious indifference to the consequences. E.g., St. Louis Southwestern Railway Co. v. Evans, 104 Ark. 89, 93, 148 S.W. 264, 265 (1912); Great American Insurance Co. v. Ratliff, 242 F.Supp. 983, 989 (E.D.Ark.1965). In ruling on a motion for judgment n.o.v., the courts (a) consider the evidence in the light most favorable to the plaintiffs as the verdict-winning parties, (b) assume that the jury resolved all conflicts of evidence in favor of the plaintiffs, (c) assume as true all facts which the plaintiffs' evidence tended to prove, (d) give the plaintiffs the benefit of all favorable inferences which may reasonably be drawn from proved facts, and (e) deny the motion if in light of the above reasonable jurors could differ as to the conclusions that could be drawn from the evidence. Hanson v. Ford Motor Co., 278 F.2d 586, 596 (8th Cir.1960) (Blackmun, J.). This standard is to be applied both in the trial court and by this Court on appeal.
 
 
 1
 There is evidence in the record that the Laurel Street crossing was abnormally dangerous[4] and that the railroad knew or should have known it. As early as 1947 and later in 1976, Prescott officials wrote the railroad asking that safety devices be installed at Prescott's unprotected railroad crossings (Tr. 72-78). The requests were refused. In 1976 an Arkansas Highway Department diagnostic team (which included a Missouri Pacific representative) investigated Prescott's four unprotected railroad crossings, including the one at Laurel Street, and recommended that available federal and state funds be used to protect two of the crossings and that the other two be closed. The Laurel Street crossing remained open and unprotected. The Highway Department assesses the relative risks of the state's railroad crossings through a "Hazard Rating Index" which takes into account (a) the number of vehicles that cross, (b) the number of trains that pass, (c) the number of tracks, (d) the accident history, and (e) local conditions. In 1976, the Highway Department applied the "Hazard Rating Index" to the Laurel Street crossing and found that it was among the most dangerous ten per cent. of the state's crossings and that in order to make the crossing safe flashing lights and warning bells were necessary (Tr. 139). Dr. Kenneth Heathington[5] informed the jury that by the time drivers could fully turn onto Laurel Street they had only sixty-two feet before they would reach the crossing (Tr. 303). As a result drivers have inadequate stopping distance if they are going more than ten miles an hour when they get onto Laurel Street (Tr. 304). The odds of a collision at the Laurel Street crossing are three times greater than the national average (Tr. 317), but the installation of flashing lights could reduce accidents to one-fifth of the otherwise expected level (Tr. 314). Tom Bryant, the railroad's Chief Grade Crossing Signal Engineer, also conceded that flashing lights or gates reduce the rate of accidents at a given location (Tr. 108).
 
 
 2
 The railroad has not, at its own expense,[6] installed any safety devices since 1972 (Tr. 58, 69) and very few since the mid-1950's (Tr. 69). No new safety devices were installed in Prescott between 1947 and 1976. The rationale seems to be, and there was testimony to this effect, that it is cheaper to be sued than to protect railroad crossings. Mike Gorman, the Assistant Train Master for the railroad in Prescott, spoke to Prescott's Kiwanis Club a year after Mr. Brown's death. Jorge H. Nasser, a member of Prescott's Kiwanis Club, questioned the railroad policies and testified as follows:
 
 
 3
 A. Yes, sir. Mr. Gorman said that uh, Prescott was one of the most hazardous and dangerous places, and so, I asked him why don't they go ahead and put gates on all the crossings in the City of Prescott. And, because by that time, we had already two up and he said that it was very expensive, but the [sic] Prescott or the State could put up about 80 or 90 percent and the railroad department would keep up the gates.
 
 
 4
 Q. But they weren't going to put them in, is that right?
 
 
 5
 A. Well, that's right, they were not going to put them in unless the State and the City would pitch in 80, 90 percent to put them up.
 
 
 6
 Q. Did you discuss with Mr. Gorman about the fact that it might be safer in the long-run [sic] to put up safety devices?
 
 
 7
 A. Yes, sir. As a matter of fact, I made the statement that it would be safer and cheaper in the longrun [sic] to put gates on all the crossings in Prescott, instead of having so many people suing the railroad.
 
 
 8
 Q. What was his response?
 
 
 9
 A. His response was, the way I understood, is that it was cheaper to have the suits than to put up the gates.
 
 
 10
 (Tr. 278-79).[7] The Arkansas Supreme Court will allow punitive damages to deter a defendant from deciding that it is cheaper to be sued and pay compensatory damages than to remedy a dangerous condition. See Forrest City Machine Works, Inc. v. Aderhold, 273 Ark. 33, 44, 616 S.W.2d 720, 726 (1981).
 
 
 11
 The railroad points out that its tracks are not solely responsible for the danger at crossings. Roads used by motor vehicles are, after all, part of the problem. It is the intersection of the two modes of transportation that creates the danger. This fact has been recognized in recent years, and state and federal public funds are being spent to protect crossings. In addition, the danger could have been removed by closing the crossing to automobiles, as well as by protecting it, and at one time the railroad was probably reasonable in expecting that the City of Prescott would close at least some of the four crossings within its boundaries. These arguments are relevant and material, and we might have accepted them had we been on the jury. But we were not on the jury, and our job is only to see that the verdict is rational and not contrary to law. In view of the clear Arkansas precedents placing squarely on the railroad a duty to protect abnormally dangerous crossings, and the evidence that this particular crossing was more dangerous than 90 per cent. of the railroad crossings in Arkansas, we are satisfied that the evidence before the jury was sufficient to support its verdict, though perhaps not by much.
 
 
 12
 At oral argument the defendant asserted that if punitive damages were imposed in every crossing accident, it would be bankrupted. We do not mean to suggest that we would uphold the propriety of punitive damages in any railroad crossing case that came before us. Our holding is limited to the facts of this case, where the plaintiff has shown that the Laurel Street crossing was among the most dangerous in the state and that the railroad ignored this danger in order to pursue other policy considerations. The power to impose damages is also the power to destroy, but the power need not be feared as long as the courts sit. Cf. Panhandle Oil Co. v. Mississippi ex rel. Knox, 277 U.S. 218, 223, 48 S.Ct. 451, 453, 72 L.Ed. 857 (1928) (Holmes, J., joined by Brandeis and Stone, JJ., dissenting) ("The power to tax is not the power to destroy while this Court sits.").
 
 
 13
 The railroad also contends that Arkansas law does not allow punitive damages in a death action. We disagree, at least where, as here, the award of punitive damages is simply an incident of the action for personal injuries that Brown would have had if he had lived. Judge Waters relied on Judge Woods's thorough opinion in Fields v. Huff, 510 F.Supp. 238 (E.D.Ark.1981). We have nothing to add to the analysis in that opinion. The district judges in Arkansas have long had a custom of following opinions of their colleagues on questions of state law, see Childers v. Southern Farm Bureau Casualty Insurance Co., 282 F.Supp. 866, 869 (E.D.Ark.1968) (Henley, J.), and we commend the practice.
 
 
 14
 Affirmed.
 
 
 15
 HENLEY, Senior Circuit Judge, dissenting.
 
 
 16
 Although I entertain serious reservations on the issue of whether Arkansas law permits recovery of punitive damages in a wrongful death action, in the absence of a definitive statement by the Arkansas Supreme Court I will defer to Judge Waters and Judge Woods[1] as well as to my Brother Arnold, a distinguished former United States District Judge in Arkansas. See Lewis Service Center, Inc. v. Mack Financial Corp., 696 F.2d 66, 69 n. 3 (8th Cir.1982) (interpretation of state law by district judge sitting in forum entitled to great deference). However, I cannot agree that the evidence in this case is sufficient to support an award of punitive damages, and for this reason I respectfully dissent.
 
 
 17
 Punitive damages are not favored in Arkansas. Diamond Shamrock Corp. v. Phillips, 256 Ark. 886, 511 S.W.2d 160, 164 (Ark.1974). Mere negligence or even gross negligence, without willfulness, wantonness, or conscious indifference, will not justify an award of punitive damages. Id. The law is established in Arkansas, and the jury was so instructed, that in order to recover punitive damages, plaintiff must prove that defendant knew or should have known that his conduct was about to inflict injury and that he continued his conduct with malice or "in reckless disregard of the consequences from which malice may be inferred." Arkansas Model Jury Instructions 2217 (emphasis added); see St. Louis Southwestern Railway Co. v. Evans, 104 Ark. 89, 148 S.W. 264, 265 (Ark.1912).
 
 
 18
 If the Laurel Street crossing was abnormally dangerous, thus imposing on the railroad a duty to provide adequate warning, it cannot be disputed that defendant failed to fulfill this duty. Indeed, by not challenging the award of compensatory damages, defendant has conceded liability for negligence. However, mere failure to exercise the degree of care due in the circumstances does not constitute wanton conduct or reckless disregard of the consequences from which malice may be inferred. See State ex rel. Kurn v. Hughes, 348 Mo. 177, 153 S.W.2d 46, 53-54 (Mo.1941) (railroad's failure to make crossing reasonably safe insufficient to support punitive damages); Sturdevant v. Erie Lackawanna Railroad Co., 319 F.Supp. 732, 737 (W.D.Pa.1970), aff'd, 458 F.2d 1214 (3d Cir.1972) (failure to use particular type of warning device at crossing insufficient to show willful and wanton conduct); Herglund v. New York, Chicago & St. Louis Railroad Co., 1 Ill.App.3d 968, 274 N.E.2d 671, 679 (Ill.App.1971) (failure to provide additional warning at extra-hazardous crossing insufficient to show more than negligence). Thus, the award of punitive damages in the present case must be justified by something other than defendant's failure to install an active warning device at the Laurel Street crossing.
 
 
 19
 The majority finds support for the award of punitive damages in the railroad's "refusal" of requests by Prescott officials to install safety devices at unprotected crossings, and in the supposed rationale for such refusal, that is, "that it is cheaper to be sued than to protect railroad crossings." Supra at 1053. I cannot accept the characterization of the railroad's failure to install active warning devices at all unprotected crossings as a deliberate refusal to respond to the concern of Prescott officials. On the contrary, the evidence shows that the railroad participated in the evaluation by the diagnostic team, accepted the team's recommendation, and complied with the subsequent agreement with the city. According to the agreement, the railroad would install active warning devices at two crossings and the city would close two crossings, including Laurel Street. The railroad completed installation in January, 1979, but the city delayed closing the Laurel Street crossing due to resistance in the community. This delay continued until Mr. Brown's fatal accident, after which the city promptly passed an ordinance closing the crossing.[2]
 
 
 20
 I am unable to conclude that the railroad's reliance on the city to abide by the agreement, however negligently misplaced, or the railroad's failure to step in and install expensive warning equipment at a crossing scheduled for closing, constitutes such conscious indifference to the consequences that malice may be inferred.[3]
 
 
 21
 Nor am I persuaded by the speculative cost-effectiveness rationale for the railroad's failure to install the equipment. The only direct evidence of such a policy consists of testimony by Mr. Nasser quoted by the majority at page 1053 supra concerning a statement allegedly made by Mr. Gorman, a railroad employee. Mr. Nasser subsequently admitted on cross-examination that he could have misunderstood Mr. Gorman. Moreover, Mr. Gorman not only denied making the statement, but further denied having any authority or knowledge on which to base the alleged statement. Even when viewed in the light most favorable to plaintiff, such scanty evidence of doubtful admissibility is simply not sufficient, in my opinion, to support an inference of malice.
 
 
 22
 I would reverse the award of punitive damages.
 
 
 
 [1]
 The Hon. H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas
 
 
 [2]
 The statute was amended in 1981, but not in any respect material to this case
 
 
 [3]
 Several weeks after the accident Laurel Street was closed to traffic, but it was subsequently reopened. The railroad crossing is still unprotected
 
 
 [4]
 Under Arkansas law, a railroad has a duty to provide active warning devices at abnormally dangerous crossings. Chicago, Rock Island & Pacific Railroad v. Gray, 248 Ark. 640, 644, 453 S.W.2d 54, 56 (1970); Fleming v. Missouri & Arkansas Railway, 198 Ark. 290, 294, 128 S.W.2d 986, 988 (1939)
 
 
 [5]
 Dr. Heathington is a civil engineer and Director of the Transportation Center of the University of Tennessee. He is a former Associate Administrator for the Traffic Safety Program of the National Highway Traffic Safety Administration of the United States Department of Transportation
 
 
 [6]
 The federal government has borne most of the cost of installing safety devices such as the ones which were installed in Prescott (Tr. 81-82)
 
 
 [7]
 Mr. Gorman's alleged statement was made in Prescott, the site of the accident, and referred specifically to crossings in that city. The District Court did not abuse its discretion, in the circumstances of this case, by holding that the statement was relevant evidence whose probative value is not outweighed by the danger of unfair prejudice. We reserve judgment as to whether the comment would be admissible in a case where the accident occurred at a different location
 
 
 [1]
 As noted by the majority, Judge Waters relied on Judge Woods's decision in Fields v. Huff, 510 F.Supp. 238 (E.D.Ark.1981). See Childers v. Southern Farm Bureau Casualty Ins. Co., 282 F.Supp. 866, 869 (E.D.Ark.1968)
 
 
 [2]
 Due to pressure from surrounding businesses, the crossing was reopened shortly thereafter
 
 
 [3]
 Moreover, I have some question as to whether the railroad had reason to know that its failure to install an active warning device was about to inflict injury. In spite of the high hazard rating, it appears that only one accident had occurred at the Laurel Street crossing in the ten years preceding Mr. Brown's death. Cf. St. Louis Southwestern Railway Co. v. Jackson, 242 Ark. 858, 416 S.W.2d 273 (Ark.1967) (three accidents in a two-week period)