DIAMOND SHAMROCK CORPORATION *v.*
Everett E. C. PHILLIPS and
Lorain S. PHILLIPS

74-66                                   511 S.W. 2d 160

Opinion delivered July 8, 1974

*Warner and Smith*, by: *J. H. Evans*, for appellant.

*Sam Sexton, Jr.*, for appellees.

LYLE BROWN. Justice. This case involves the correlative rights of the owners of the surface estate and the separate owner of the minerals. Appellant Diamond Shamrock Corporation caused a gas well to be drilled under a proper oil and gas lease executed by the owners of the minerals. Appellees, the Phillipses, owned only the surface estate. The suit was brought on the theory that the drilling of the well at the precise location where appellees intended to build a home was "wrongful, and unreasonable and demonstrated a wholly callous indifference to the rights of the plaintiffs". Appellees were awarded $4,000 actual damages and $2,000 punitive damages.

For purposes of discussion we divide, as did the parties, appellees' land into two separate tracts. The 5-acre tract abuts U.S. highway 64 with a frontage of some 600 feet. It is served by natural gas, city water, and electricity. The appellees bought it for the avowed purpose of building their retirement home, paying $1,000 an acre for it. The 80-acre tract, which is pasture land, lies to the rear (north) and to the west of the 5-acre tract and does not come out to the highway.

By virtue of an order of the Arkansas Oil and Gas Commission, Section 18, composed of 640 acres in which section appellees' land is located, was designated as the Union City Field and as a unit for the purpose of exploring for gas. The order further provided for one drilling site for each section of land and that it should be located at the discretion of those who proposed to drill, within a certain radius from the center of the section. Appellant selected three possible drilling sites

on the unit, all located on appellees' 80-acre tract. One point was designated as "original location" and it was 150 feet north of the 5-acre tract. Alternate No. 1 and Alternate No. 2 locations were also in the pasture land and north and west of the 5-acre homesite.

Shortly prior to May of 1971 appellees had moved a house trailer onto the 5-acre tract where they intended to live during the construction of their new home. They also fenced a garden tract. Phillips testified he was approached by an official of appellant who was in charge of a surveying crew. The official was Clovis Moody who died before the trial. Phillips testified that Moody placed a stake on the five acres and said "he might drill there". Phillips said he protested that he did not want an encroachment on the homesite; whereupon Mr. Moody acceded to his request. Phillips said Moody assured him the well could be drilled behind the house site and in the pasture. With that assurance Phillips said he went to California to sell some property he owned there. When Phillips returned in June he found the well had been completed and was located over on the 5-acre tract. The well was located, according to appellant's exhibit introduced at the beginning of the trial, 160 feet directly south of the spot marked "original location". Three slush pits containing salt water, a meter shed, a tank, and well head equipment were in place. Phillips further testified that there was not enough room between those structures and the highway "because there wouldn't be enough yard, and it's too close to the well to build". He said the equipment "takes up a strip about 50 feet wide and 100 feet long".

According to the witness the well was drilled 24 feet west and 150 feet south of the point where the permit obtained from the Oil and Gas Commission showed it was to be drilled. His testimony was corroborated by Shamrock's exhibit one, being a scaled plat entitled "Oil Well Location". It actually showed the well to be 160 feet south of the original location.

The witness gave his opinion as to the fair market value of the homesite. Those figures were $7,500 before the well was drilled and $500 after the fixtures were in place. That testimony was given over the objection of appellant to the effect that it was not the proper measure of damages.

Darrell Stepp testified he sold appellees the homesite for $5,000. He said he was familiar with home locations up and down the highway in the vicinity of the land; that appellees originally had a beautiful homesite; and that there is not now room between the well fixtures and the highway for a desirable building site.

Mrs. Phillips testified she was present and participated in the conversation with Moody. "He mentioned the location where the well is now and we seriously objected to it because it was our homesite, and he said they would find another site." After further discussions Mr. Moody said, according to the witness, that the company would drill at what was designated as "Original Location". As we have said, that site was 150 feet back of the homesite. She said when she and her husband returned from California they discovered that the well was drilled on the homesite. "Mr. Moody told us he was sorry to even see us because he was gone on a two week vacation and they thought that was where it was supposed to be, and I wasn't here to tell them any different."

Appellees called as a witness, Bill Mosley, a geologist. He is in charge of the Ft. Smith office of the Arkansas Oil and Gas Commission. The area in controversy is within his jurisdiction. He explained that a driller is required to file a notice of intent to drill, that notice being accompanied by a plat showing the proposed location of the well. He presented a copy of the plat filed by appellant. It showed the proposed location to be in the pasture land to the rear of appellees' homesite. After the well is completed the driller is required to file a completion report. He exhibited a copy of that report filed by appellant. That report also shows the well to be in the pasture. The witness said the first time he knew the well was actually on the homesite was when he heard in the opening statement at the trial that the well was not at the location shown in the application to drill and in the report of completion.

On cross-examination the witness testified that a driller has to be careful in selecting a drilling site to avoid faults and salt water. He was shown a geological map of the involved area and he conceded that in order to avoid drilling into a fault the geologist was "very limited in where he placed or

recommended that a well be drilled within the 160 acre area". He said that the location selected was a good one, the well being one of the largest gas producing wells in western Arkansas.

The first witness called by appellant was David Daggs. He is a drilling rig supervisor and worked for the driller who was employed by appellant to drill the well on appellees' property. He said he heard some, but not all, of the conversations between Clovis Moody and the appellees, being there because the location for the well was being staked. He testified that the original location (behind the homesite and in the pasture) fell near appellees' garden. He said Moody told appellees he could move the location a little south and get away from the garden because they objected to losing their garden site. "Mr. Moody and myself went down a little south of the garden and showed Mr. and Mrs. Phillips a location. They still didn't want the location built there but said it would be better than up in their garden." On cross-examination he conceded that he did not have any explanation as to why the well was actually drilled 160 feet south of the location certified to the Arkansas Oil and Gas Commission. He recalled that appellees did not want the well located in front of the proposed site of the house and wanted it constructed "back behind the house up north".

The next witness called by appellant was Dick Williams, a qualified geologist employed for several years by appellant. He was responsible for selecting the location of gas wells in western Arkansas and particularly a site for the well on appellees' property. He selected the "original location" as shown on appellant's exhibit one. The location was selected because it revealed the best possibilities for avoiding a fault on the north and high enough to stay out of salt water on the south. He said the well was actually drilled 160 feet south of the original location he selected. "The original location picked by me was the only one I was aware of and I knew nothing about the alternate location staked to the north of the original location."

With respect to the law governing this case we first look to the respective rights of the owner of the minerals and the separate owner of the surface. The general rule governing the

right of the mineral owner is aptly stated in 10 Thompson on Real Property § 5561 (1940):

> As against the surface owner, the owner of the minerals has a right, without any express words of grant for that purpose, to go upon the surface to drill wells to his underlying estate, and to occupy so much of the surface beyond the limits of his well or wells as may be necessary to operate his estate and to remove the product thereof. * * * It is a well-settled principle that injury necessarily inflicted in the exercise of a lawful right does not create a liability. The injury must be the direct result of the commission of a wrong.

Our case of *Koury* v. *Morgan*, 172 Ark. 405, 288 S.W. 929 (1926) quotes the same language from a previous edition of *Thompson*.

An injury to the surface may be said to be the result of the commission of a wrong when the use of the surface is unreasonable. In *Martin* v. *Dale*, 180 Ark. 321, 21 S.W. 2d 428 (1929), we said the driller had a right to ingress and egress but in exercising that right "it was his duty to do so in the manner least injurious to his grantor. . . . " Another case which is very persuasive is *Getty Oil Co.* v. *Jones*, 470 S.W. 2d 618 (Sup. Ct. Texas 1971). That case refers to "the rules of reasonable usage of the surface". Jones, the surface owner, installed irrigation equipment above the ground. Thereafter, Getty Oil drilled wells and installed pumping equipment which prevented the use of the irrigating equipment. The court said "where there is an existing use by the surface owner which would otherwise be precluded or impaired, and where under the established practices in the industry there are alternatives available to the lessee whereby the minerals can be recovered, the rules of reasonable usage of the surface may require the adoption of an alternative by the lessee". Then in 4 Summers O. & G., § 652 (1962) we find this statement: "If the acts [of the lessee] complained of are found not to constitute a reasonable use of the surface, . . . . the lessee is liable for the injury done . . . . "

With the evidence at hand the jury in the case before us evidently concluded that appellant's driller was unreasonable

in that he disregarded the site selected by appellant's geologist for the drilling and dropped south 160 feet. (The reason for the change in location was never explained.) Furthermore, the jury could have found that it was wrong for appellant, through its agents, to make a firm commitment not to drill on the homesite and thereafter, in the absence of appellees, to go upon the homesite and sink the well.

We conclude that the jury was warranted in returning a verdict for actual damages. Since the damages to the homesite were permanent, the measure of damages is the difference in the before and after value of the property. *Standard Oil Co. of La.* v. *Goodwin,* 174 Ark. 603, 299 S.W. 2 (1927); 4 Summers O. & G. § 658 (1962).

What we have thus far said disposes of appellant's first six points with the exception of point four. That point challenges the propriety of instructing the jury on punitive damages. Punitive damages "are not a favorite of the law". *Harris Manufacturing Co.* v. *Williams,* 164 F. Supp. 626 (1958). Negligence alone, however gross, is not sufficient to sustain such an award. *St. Louis, I.M. & S. Ry.* v. *Dysart,* 89 Ark. 261, 116 S.W. 224 (1909). Gross negligence, without willfulness, wantonness, or conscious indifference, does not justify infliction of punitive damages. *St. Louis S.W. Ry.* v. *Evans,* 104 Ark. 89, 148 S.W. 264 (1912). The burden of proof was of course on appellees. For all we know the drilling on the homesite could have been caused by a breakdown in communications between the driller and the geologist; or, appellant's superintendent could have negligently left the marker on the homesite. We do not think appellees met their burden of proof and the jury was left to speculation and conjecture as to the cause of the mixup, if there was once. Certainly, appellees offered no proof of willful or wanton misconduct from which malice could be implied. *Chicago, R.I. & P. Ry.* v. *Whitten,* 90 Ark. 462, 119 S.W. 835 (1909).

Appellant's final point is that the court erred in not giving a more specific instruction on actual damages. The court told the jury that if it found for appellees "you must then fix the amount of money which will fairly and reasonably compensate them [for] the damages to the land occasioned by

such use''. No further instruction was requested. The absence of an instruction with a more specific measure of damages is raised for the first time on appeal. The only evidence introduced on damages concerned the before and after value of the lands, so there was no other yardstick for the jury to use.

Affirmed as to actual damages; reversed and dismissed as to punitive damages.

BYRD, J., dissents in part. He would affirm as to punitive damages.