NATIONAL BANK OF COMMERCE (of El Dorado, Arkansas), as Conservator of the Estate (Only) of Jerry Wayne Yancey and Janice Yancey, His Wife *v.* The McNEILL TRUCKING COMPANY, Inc., et al.

91-215                                    828 S.W.2d 584

Supreme Court of Arkansas
Opinion delivered April 6, 1992

82

*Bob Davidson*, for appellant.

*Walter A. Murray*, for appellee.

JACK HOLT, JR., Chief Justice. The issues in this case revolve around the adequacy of damages awarded by the trial court on behalf of Jerry Yancey, who was injured in an automobile accident caused by the appellee, The McNeill Trucking Company, Inc. (McNeill).

On September 29, 1989, the van driven by Mr. Yancey was hit from behind by a semi-truck driven by a McNeill employee. At the scene of the accident, a McNeill representative assumed full corporate responsibility for the accident to the investigating police officers. The appellant, National Bank of Commerce (Bank), filed suit against McNeill for damages and then requested a non-suit without prejudice as to the liability insurance carrier. Ultimately, the trial court declared a mistrial as a result of Mr. Yancey's counsel's actions before the jury; the parties stipulated, however, to a bench trial in order to continue the trial.

On March 7, 1991, the trial court filed its findings of fact and conclusions of law; it found that liability for the accident was admitted by McNeill and awarded the Bank $5,558.61 for medical expenses, $5,335.20 for lost wages, and $2,000.00 for pain and suffering. No award was made for loss of consortium or for punitive damages, and all other claims were dismissed.

The Bank filed a motion for review or for a new trial, which was denied by the trial court. The Bank now asserts three points of error on appeal: 1) the trial court erred in disallowing any damages for the heart, 2) the trial court erred in disregarding

undisputed testimony, as well as the McNeill's own admissions, and utilizing surveillance video tapes to attempt to justify arbitrary and unsupported rulings as to damages, and 3) the trial court erred in disallowing punitive damages.

The Bank's first argument relating to the disallowance of any damages for the heart is persuasive, and we reverse and remand the judgment of the trial court.

Under A.R.C.P. 59(a), the inadequacy of the recovery is a ground for a new trial even in the absence of other error. In *Smith* v. *Pettit*, 300 Ark. 245, 778 S.W.2d 616 (1989) (citing *Warner* v. *Liebhaver*, 281 Ark. 118, 661 S.W.2d 399 (1983)), we reiterated that when the primary issue is the alleged inadequacy of the award, rather than a question of liability, we will sustain the trial court's denial of a new trial unless there is a clear and manifest abuse of discretion. An important consideration in this review is whether a fair-minded jury might reasonably have fixed the award at the challenged amount. Also, in reviewing a finding of fact by a trial court, we consider the evidence and all reasonable inferences therefrom in a light most favorable to the appellee. *Jernigan* v. *Cash*, 298 Ark. 347, 767 S.W.2d 517 (1989).

In this case, the trial court held in its findings of fact and conclusions of law that ". . . on September 29, 1989, Jerry Yancey sustained a back strain, proximately caused by the accident, for which he was caused to incur medical bills, lose wages and suffer pain for a period of no more than six months, and not later than March 29, 1990. . . . Expenses beyond March 29, 1990, are disallowed, as are those relating to the heart." The Bank initially asserts that the trial court erred in disallowing any damages for the heart.

The accident occurred on September 29, 1989, at which time Mr. Yancey was treated at the University of Arkansas Medical Center (UAMS) emergency room for musculoskeletal pain; Mr. Yancey then went to Dr. Joe Buford, a family practitioner, the next day complaining of soreness in his lower abdomen and back. Yancey returned to Dr. Buford on October 2 and 4 with the same complaint; at no time did Mr. Yancey complain of chest pain or heart trouble. Apparently, Mr. Yancey went to the UAMS on October 10, where an EKG was performed on him; the results

indicated that the pain was muscular/pectoral in nature and not related to the heart muscle.

On October 11, Mr. Yancey went to see Dr. Austin Grimes, an orthopedic surgeon, at the request of his attorney. At that time, Dr. Grimes noted Mr. Yancey's complaint as being lumbar related and began treatment for his back. When Mr. Yancey returned to Dr. Grimes's office on November 10, he told Dr. Grimes that he had chest pain on both sides. As Mr. Yancey was not responding to the therapy he had prescribed, Dr. Grimes wanted to treat Mr. Yancey with a transcutaneous electrical nerve stimulator (T.E.N.S.) unit, but did not want to prescribe the unit until Mr. Yancey had been checked out by a cardiologist because the unit could aggravate a heart condition.

Dr. Grimes referred Mr. Yancey to the UAMS Center in Little Rock, where he was treated by a trauma specialist, Dr. John Cone. Based on Mr. Yancey's statements and history, Dr. Cone performed a physical exam on him and determined that "there is a greater than fifty percent chance that he has costochondritis [an inflammatory process that involves the cartilages that adjoin the ribs and the breast bone]." Dr. Cone then referred him to the cardiology department for further evaluation. Mr. Yancey was hospitalized from January 2 to January 4, 1990, by Dr. Joe Bissett, a cardiologist, for an echocardiogram and a coronary angiogram, the test results of which were normal.

The Bank essentially argues 1) that the trial court was adversely affected after reviewing McNeill's surveillance tapes of Mr. Yancey that depicted him performing a variety of physical activity inconsistent with his claim of permanent and total disability, 2) that the heart-related expenses were within the trial court's six month cut-off period, and 3) that Mr. Yancey was referred for treatment and testing for his heart by his treating physicians.

McNeill presented surveillance video tapes into evidence that showed Mr. Yancey engaging in physical activities that he claimed he was incapable of performing, i.e., overhead arm extension, lifting heavy objects, bending, stooping, and twisting. McNeill also presented evidence that Mr. Yancey had a prior condition of heart pain; in fact, the notation in his medical records reflected "a long history of dyspeptic symptoms including heart-

burn, epigastric pain. All relieved by antacid and milk." Dr. Winston Wilson, a clinical psychologist, testified that Mr. Yancey was a hypochondriac prone to exaggeration of his symptoms, upon the recitation of which his treating physicians relied. McNeill also points out that Mr. Yancey did not see a specialist for his chest pains until forty-five days after the accident.

The evidence in the record shows that Mr. Yancey complained of chest pains at his October 11 orthopedic examination with Dr. Grimes. The record is very clear that Dr. Grimes's decision to place him on the T.E.N.S. unit, which might help cure Mr. Yancey's back, not his heart, was the motivation for the referral to a cardiologist. Dr. Grimes is an orthopedic surgeon who knew that the T.E.N.S. unit could aggravate a preexisting heart condition. Mr. Yancey's medical records showed a long history of dyspeptic symptoms and, whether real or hypochondriacal, the documented possibility of a heart condition had to be explored in order to treat the conditions caused by the accident.

There is no challenge to the propriety of Dr. Grimes prescribing the use of the T.E.N.S. unit as treatment for the back pain that was attributed to this accident. In fact, Dr. Grimes's treatment, including that administered during the six-month recovery period as limited by the trial court, was used as a basis for the award of all other damages. While it is true that Dr. Cone, the trauma specialist, first listened to Mr. Yancey and later reviewed his history to conclude that there was a possibility of costochondritis, the initial referral was triggered by Dr. Grimes's determination that the T.E.N.S. unit was warranted. Even if hypochondriasis led to an exaggeration of symptoms in the history provided to Dr. Cone by Mr. Yancey, it is clear that Mr. Yancey did not seek out treatment related to a heart condition but rather was referred by the orthopedist to ensure that the preferred treatment for the injuries sustained in the accident would not aggravate another condition. The subsequent referral to the cardiologist must also be attributed to Dr. Grimes and his desire to place Mr. Yancey on the T.E.N.S. unit.

Consequently, after viewing the facts in the light most favorable to McNeill, we find that the record supports only the conclusion that the charges incurred as a result of Dr. Grimes's decision to utilize the T.E.N.S. unit resulted from the accident.

Accordingly, the trial court erred in disallowing as damages the medical expenses attributable to Mr. Yancey's heart examinations. *Compare Warner* v. *Liebhaber, supra.* (The parties were involved in an automobile accident; the injured party incurred medical expenses of $12,285.00, and sought recovery of $100,000 for personal injuries and $1,500 for property damages. The defendants admitted liability, but the jury only awarded the injured party $2,500. The plaintiff appealed from the trial court's denial of her motion for a new trial on the single issue of the inadequacy of the verdict. We affirmed the adequacy of the award on two bases: 1) the jury could have found that the plaintiff was not seriously injured in the collision, and 2) the jury could have found that the plaintiff's principal items of damage — medical expenses — were not fairly attributable to whatever back pain she may have suffered.)

■ The Bank also claims that the trial court erred in disregarding undisputed testimony, as well as McNeill's own admissions, and utilizing the surveillance video tapes to attempt to justify arbitrary and unsupported rulings as to damages. Again, this argument is governed by the same standard of review as the Bank's first point of error. The Bank presented testimony of Mr. Yancey's treating physicians and physical therapist as to the extent of his injuries. McNeill presented three surveillance videos that belied this testimony and showed Mr. Yancey performing physical activities supposedly beyond his capabilities, i.e., heavy bending, stooping, lifting, and twisting. Consequently, the Bank's testimony was hardly undisputed.

The Bank's reference in its brief to "McNeill's own admissions" in this point of error misinterprets the content and context of the proceedings in the record with regard to this claim. The Bank attempts to characterize the dialogue among counsel and the court as one relating to the issue of malingering, when in fact the point related to an objection as to the cumulative use of hypothetical questions. This argument is of no consequence since McNeill's focus was that Mr. Yancey suffered from hypochondriasis and exaggerated his complaints.

■ Additionally, Dr. Grimes stated that one could expect to recover from an injury such as Mr. Yancey's in four to six months. Therefore, the six month cut-off period is justified by the

Bank's own witness, and a fair-minded jury could easily have disbelieved all, or portions, of the testimony presented by the Bank and found that all of Mr. Yancey's medical costs were not attributable to the accident with McNeill's vehicle. In sum, the trial court's assessment of damages other than medical bills relating to the examination of Mr. Yancey's heart was not a manifest abuse of discretion. *See Gilbert* v. *Diversified Graphics*, 286 Ark. 261, 691 S.W.2d 169 (1985).

For purposes of remand, we will also discuss the Bank's assertion that the trial court erred in disallowing punitive damages. In *Missouri Pac. R.R.* v. *Mackey*, 297 Ark. 137, 760 S.W.2d 59 (1988), we stated that punitive damages are only justified when the defendant acts wantonly or with such conscious indifference to the consequences of his acts that malice may be inferred; negligence, however gross, will not justify an award of punitive damages.

The Bank unsuccessfully attempted to introduce evidence that McNeill's maintenance employees had used drugs at some point during their employment, and there was no direct evidence that they had used drugs on the job.

The Bank's tandem assertion that McNeill knew that it was dangerous to allow a bobtail semi-truck to operate on the highway was not preserved for appeal, and we decline to address it. After examination of the record, we find that this argument was not pled and, although alluded to by the Bank in its brief, the trial court was not apprised of this argument as a basis for the Bank's claim of punitive damages. *Pearrow* v. *Feagin*, 300 Ark. 274, 778, S.W.2d 941 (1989).

In sum, there was simply no evidence that McNeill knew of the alleged drug use, or recklessly disregarded the consequences from which malice could be inferred to support a claim of punitive damages.

The judgment of the trial court is reversed and remanded for retrial on the issue of compensatory damages.

DUDLEY and GLAZE, JJ., concur.

HAYS and BROWN, JJ., dissent.

ROBERT H. DUDLEY, Justice, concurring. I concur in the

result reached by the majority opinion and write separately to set out two procedural issues involving punitive damages that I hope someday will be brought before us in an adversarial manner.

The appellant, plaintiff below, argues that he should have been awarded punitive damages because the appellee, the defendant trucking company, operated its tractor without a trailer, and a tractor without a trailer cannot be stopped within a safe distance. The appellant contends that the trucking company knew of this danger and yet, in order to profit, operated the tractor without a trailer and, as a direct result, the driver was unable to stop the tractor, and it struck and injured the appellant. The argument was not preserved for appeal and lends itself to this opinion since we do not decide it on the merits.

Our common law authorizes the assessment of punitive, or punishment, damages against a wrongdoer as a way of furthering our governmental interests of deterring willful and wanton tortious conduct. These damages for punishment are awarded directly to the private plaintiff, rather than to the government, as are fines when the criminal law is used to advance similar governmental interests.

This court traditionally has been very cautious, perhaps overly so, about affirming punitive damages in vehicle accident cases. We have held that there was the requisite substantial evidence of willful and wanton misconduct in only two classes of vehicle accident cases; (1) when the defendant driver was drinking, or drunk, or using drugs, *see, e.g., Honeycutt* v. *Walden*, 294 Ark. 440, 743 S.W.2d 809 (1988), and (2) when the defendant was racing, *see, e.g., Turner* v. *Rosewarren*, 250 Ark. 119, 464 S.W.2d 569 (1971). On the other hand, we have held that driving 65 to 70 miles per hour on loose gravel was not sufficient evidence of willful and wanton conduct. *Edwards* v. *Jeffers*, 204 Ark. 400, 162 S.W.2d 472 (1942). We have held that punitive damages may not be assessed against an individual who is involved in a hit and run accident. *Freeman* v. *Anderson*, 279 Ark. 282, 651 S.W.2d 450 (1983). We have said that evidence that a defendant was driving between 55 and 70 miles per hour in a 45 miles per hour zone on a wet street was not sufficient evidence of willful and wanton misconduct. *Lawrence* v. *Meux*, 282 Ark. 512, 669 S.W.2d 464 (1984). We affirmed a directed verdict for a

defendant in a wrongful death case when a father allowed his fifteen-year-old daughter to drive his car, and the child drove only 559 feet from a parked position, but reached a speed of approximately 50 miles per hour, entered an intersection, and killed the plaintiff. *Steward* v. *Thomas*, 222 Ark. 849, 262 S.W.2d 901 (1953). More recently, we declined to award punitive damages in a case that involved an overloaded truck that was being driven at an excessive speed even though its brakes had not been properly maintained. *National By-Products, Inc.* v. *Searcy House Moving Co., Inc.*, 292 Ark. 491, 731 S.W.2d 194 (1987). As a last example, we reversed an award of punitive damages in a case where a truck was parked on the highway right-of-way so that the passengers could relieve themselves. *Alpha Zeta Chapter of Pi Kappa Alpha Fraternity* v. *Sullivan*, 293 Ark. 576, 740 S.W.2d 127 (1987). We have said that the cases involving drinking or drugs or racing exemplify "willful and wanton" conduct, but all others demonstrate only "gross negligence." In summary, we have drawn a clear line defining those types of automobile accident cases in which punitive damages will be affirmed. I assume that every trial judge and every trial lawyer in the State is familiar with this line.

The reader of this opinion might pause at this point and ask what the result would have been in this case, even if the appellant had been able to prove that a tractor without a trailer could not be stopped within a safe distance, and that the defendant trucking company was aware of such fact, and that the defendant trucking company, in order to profit, directed one of its employees to drive the tractor without a trailer to some destination and enroute the accident occurred, and the plaintiff was injured solely because the tractor could not be stopped. The answer is obvious, and it raises the significant issue which I hope we will be asked to address: Does such a result adequately accommodate and advance the governmental interests involved? It is a difficult proposition and, before exploring it, and perhaps in defense of our opinions, the reader should keep in mind that the interests the parties have at stake in a punitive damages case are not equal. The purpose of punitive damages is to vindicate the public interests; not to award the plaintiff a windfall. The windfall to the plaintiff is only a secondary result. On the other side, a defendant is punished by punitive damages. The word "punitive" denotes punishment for

wrongdoing. Our opinions have used the words "exemplary damages" which means to make an example of the wrongdoer. If punitive damages are improperly awarded, the defendant suffers far more than a plaintiff does if the jury incorrectly fails to give him a windfall.

Our cases have drawn a clear line that is meritorious for the goal of judicial consistency, but meretricious for advancing the governmental interests of preventing willful and deliberate tortious conduct. We have drawn it, in part, according to the nature of the tort and not solely on the nature of the tortious wrongdoer's conduct. Punitive damages and the affirmance of those damages ought to be based solely on the nature of the tortfeasor's *conduct*. *See* AMI 2217. We have said, "[T]he boundary between gross negligence and conduct that can be characterized as willful and wanton is indistinct. . . ." *Alpha Zeta Chapter of Pi Kappa Alpha Fraternity* v. *Sullivan,* 293 Ark. 576, 585, 740 S.W.2d 127, 132 (1987), but, if today we were to change the nature of our review and begin to look solely at the wrongdoer's conduct, there is the worrisome prospect that, without something more, many of the routine automobile accident cases might become subject to the uncontrolled award of punitive damages, and the worthwhile governmental purposes of punitive damages would be undermined.

Punitive damages in Arkansas serve the desirable and proper governmental interests of deterrence and retribution, *Thomas Auto Co., Inc.* v. *Craft,* 297 Ark. 492, 763 S.W.2d 651 (1989), and if they are only occasionally awarded they are not effective. *McClellan* v. *Brown,* 276 Ark. 28, 632 S.W.2d 406 (1982). In fact, we reversed an award of punitive damages in *McClellan* v. *Brown, supra,,* in part, because they were not regularly awarded in that type of case and, as a result, we did not think they would have a deterrent effect. Punitive damages are designed to make a person or corporation internalize the cost of willful and tortious conduct and act accordingly. However, if a fact finder were to make an award of punitive damages based upon sympathy or prejudice, without being subject to meaningful review, there would be a danger of excessive deterrence, a public conception of automobile accident cases as damage lotteries, and the governmental interests would be undermined. Without doubt, uncontrolled awards of punitive damages in automobile accident cases

would not serve the governmental interests. Likewise, the governmental interests would not be well served if punitive damages were seldom awarded and, if awarded, almost never affirmed. In such a situation there would be too little deterrence, and I suspect that is our plight. In sum, the governmental interests are best served by allowing punitive awards that correctly *balance* the competing risks in order to adequately deter willful and wanton tortious conduct.

Since the case of *National By-Products, Inc.* v. *Searcy House Moving Co., supra,* I have thought about the need for a change in our clear line involving automobile accident cases. Other jurisdictions and legal writers have addressed the issue. The Supreme Court of Wisconsin has determined that the governmental interests can be best served by requiring a plaintiff to prove willful or wanton misconduct by the standard of clear and convincing evidence. *Wangen* v. *Ford Motor Co.,* 294 N.W.2d 437 (1980). The University of Alabama School of Law and the *Alabama Law Review* sponsored a symposium on punitive damages and many of the leading writers presented articles on the subject. Symposium, *Punitive Damages,* 40 Ala. L. Rev. 687 (1989). An article that provides part of the basis of this opinion is M. E. Wheeler, *The Constitutional Case for Reforming Punitive Damage Procedures,* 69 Va. L. Rev. 269 (1983).

Given the opportunity, we should consider changing the evidentiary standard for punitive damages to the standard of clear and convincing evidence. There are a number of reasons for such a change. Jurors try to fill their obligation to decide cases according to the instructions given them, and a clear and convincing evidentiary standard would cause them to be more hesitant to impose punitive damages in inappropriate circumstances, and it might dampen any sympathy or prejudice. Punitive damages are imposed as a form of punishment, and the higher evidentiary standard is more like the evidentiary standard used for punishment in criminal cases. After all, punitive damages are enough like criminal punishment for the Supreme Court to have considered whether punitive damages bar a subsequent criminal trial under the double jeopardy concept. *Rex Trailer Co.* v. *United States,* 350 U.S. 148 (1956). We have said that punitive damages are not a favorite of the law, *Diamond Shamrock Corp.*

v. *Phillips,* 256 Ark. 886, 511 S.W.2d 160 (1974), and, since they are not a favorite, the higher standard would seem more appropriate. The clear and convincing standard would compensate for the imbalance between the risks of the parties, and, correspondingly, there is no sound reason to require a defendant to bear the greater risk of the preponderance of the evidence standard. The higher evidentiary standard would further governmental interests by avoiding excessive deterrence or erroneous punishment in the form of unjustified punitive damages.

With the clear and convincing standard, an appellate court could draw the clear line on the *tortfeasor's conduct alone,* and not on the type of automobile accident. Judicial review would be accomplished with considerably more confidence. An appellate court would be more likely to hold that, if the plaintiff established the requisite conduct on the part of the defendant, the decision whether to award punitive damages was entirely within the jury's discretion and should be affirmed. In this way, the worthwhile purposes of punitive damages would be accommodated and advanced.

A second procedural change to be considered, and one that could easily be adapted from criminal procedure, would be the bifurcation of punitive damages trials. This procedural change would permit the trial of punitive damages issues only after the jury had rendered a verdict on liability and had awarded compensatory damages. The jury would not hear evidence on punitive damages issues, including the defendant's wealth, until it had first found liability and awarded compensatory relief. Again, the governmental interests would be advanced. The procedure would reduce the risk that inflammatory punitive damages evidence would cause the jury to improperly resolve liability issues against the defendant and, if the higher evidentiary standard were adopted, it would eliminate the likelihood of confusion arising from applying one standard of evidence for the compensatory damages and another standard for the punitive damages. In addition, if an appellate court found error in the punitive damages phase of the trial, it could reverse only that phase for retrial. While this opinion discusses only automobile accident cases, the same procedures necessarily would be applicable to all punitive damages trials, including, for example, products liability cases against manufacturers, malpractice cases

against lawyers or doctors, and defamation cases against newspapers or broadcasters.

In summary, our present clear line in automobile accident cases does not fully accommodate and adequately advance the governmental interests involved in punitive damages cases. I would hope that the possible changes discussed in this opinion might be brought before this court in an adversarial manner, with briefs on both sides, so that the court might consider balancing the risks in order to further the governmental interests. It is a matter which we have never addressed.

TOM GLAZE, Justice, concurring. I agree with the majority opinion as far as it goes, but other considerations not mentioned in the opinion also warrant the reversal of this case. No dispute exists over the fact that appellant experienced chest pains after appellee's (McNeill Trucking Company, Inc.) semi-tractor struck appellant's vehicle from behind. As mentioned in the lower court's findings, the origin or cause of appellant's chest pains was in question, and the court ultimately concluded those pains were unrelated to the accident. That finding, however, does not resolve the issue as to whether appellant is entitled to medical expenses that appellant incurred in order to insure the pains he experienced after the accident were not due to a cardiac contusion caused by his having hit the steering wheel as a result of the impact from McNeill's semi-tractor.

Because of appellant's complaint of chest paints, Dr. Austin Grimes, an orthopedic surgeon, refused to administer a TENS unit on him until he was checked by a cardiologist. A TENS unit could have aggravated a heart condition. Grimes was shown excerpts of the surveillance tape which the appellees took of appellant, but he still adhered to his belief that appellant had not exaggerated or faked the extent of his injuries.

Dr. Joe Bissett, a cardiologist, evaluated the appellant and stated that the appellant was justified in seeing a cardiologist regarding his chest pain and that a cardiac contusion could occur during an accident like the one in which appellant was involved where the steering wheel hit him in the chest. Dr. John Cone, a trauma specialist, related that the paramedics, who had taken appellant to the emergency room after the accident, noted the steering wheel of appellant's vehicle had been damaged. Cone,

after evaluating appellant, suggested appellant see Dr. Bissett to rule out any cardiac injury.

Whether appellant is or is not a hypochondriac, as appellees assert, is not determinative of appellant's entitlement to medical expenses incurred as the result of advice given him by his treating doctors. Appellees offered no medical evidence to refute the doctors' testimonies that indicated further evaluation was needed to assure appellant's chest pains were not due to a heart condition. Appellees did present Dr. Winston Wilson, a clinical psychologist, who testified the appellant suffered from hypochondriasis. But Wilson further added that he could not testify as to appellant's physical condition.

The appellees admitted liability in this case, and the court awarded appellant $5,558.61 for medical expenses, $5,335.20 for lost wages and $2,000.00 for pain and suffering. Clearly, by awarding these damages, the trial court acknowledged the appellant was injured as a result of appellees' negligence even though appellees attempted to show otherwise by the surveillance tapes taken of appellant after the accident.

Once the trial court decided the appellant's injuries resulted from appellees' negligence, the appellant was then entitled to all reasonable expenses for any necessary medical treatment. Here, appellees offered absolutely *no* evidence to show appellant's cardiology treatment was unnecessary. To the contrary, all medical evidence showed such treatment was required.

While the trial court found appellant's chest pains were unrelated to the accident, appellees, as tortfeasors, must take their victim as they find him. *Clawson* v. *Rye*, 281 Ark. 8, 661 S.W.2d 354 (1983). The physical and medical evidence reflect appellant experienced chest pains both before and after the accident, and before Dr. Grimes dared treat appellant's orthopedic needs, Grimes opined that he had to rule out any possible heart problems the appellant might have. Dr. Bissett related such evaluations were justified under these circumstances. None of these factors indicating a medical need for the evaluation of appellant's heart is in any material way offset or negated by appellees' surveillance tapes.

For the above reasons, I agree the case should be reversed

and remanded.

STEELE HAYS, Justice, dissenting. I respectfully submit the majority reverses this judgment for a new trial on a mistaken assumption that because testimony of some medical experts was undisputed, it was incumbent on the trial judge, as fact-finder, to accept such evidence. That is not the law. The testimony of medical experts, like that of other experts, is not binding on the fact-finder, however reliable such evidence might seem. The fact-finder may accept or reject all or any part of the testimony of expert witnesses. *The Western Union Telegraph Co.* v. *Byrd, Adm'x.*, 197 Ark. 152, 122 S.W.2d 569 (1938). "Even when several competent experts concur in their opinions and no opposing expert evidence is offered, the jury is still bound to decide the issue upon its own fair judgment." *Western Union Telegraph Company* v. *Turner*, 190 Ark. 97, 77 S.W.2d 633 (1935).

It is clear the trial judge in this case did not accept the medical opinion that the expenses incurred in connection with Mr. Yancey's cardiac complaints were attributable to the initial trauma or to the subsequent treatment of other injuries. The judgment should be affirmed.

BROWN, J., joins in this dissent.

ROBERT L. BROWN, Justice, dissenting. The majority's decision overturns a line of cases that extends back to 1983. *See Kratzke* v. *Nestle-Beich, Inc.,* 307 Ark. 158, 817 S.W.2d 889 (1991); *Hacker* v. *Hall,* 296 Ark. 571, 759 S.W.2d 32 (1988); *Thigpen* v. *Polite,* 289 Ark. 514, 712 S.W.2d 910 (1986); *Warner* v. *Liebhaver,* 281 Ark. 118, 661 S.W.2d 399 (1983). By doing so, the decision opens up an issue that had previously been decided and subjects the matter once again to resolution on a case-by-case basis.

The authority adduced above, beginning with *Warner* v. *Liebhaver,* stands for the proposition that the trier of fact may choose to disbelieve the testimony of any witness and award damages accordingly. That is what the trial judge as the trier of fact did in the case before us. The majority, however, takes this precedent and casts it to the four winds. It then usurps the factfinder's role by proceeding to weigh the testimony and decide

the legitimacy of Yancey's cardiac expenses.

There is a firm basis for the trial judge's decision to reject these expenses. As the majority admits, Dr. Grimes did not refer Yancey to a cardiologist until six weeks after the accident and only then because of Yancey's statements about chest paints and as a safety measure prefatory to back treatment by a transcutaneous electrical nerve stimulator. The trial judge could well have chosen to disbelieve the authenticity of Yancey's complaint, and it was that complaint that was the catalyst for Dr. Grimes's referral to a cardiologist. As it turned out, there was no injury to the heart. Yancey had a history of heartburn, was a hypochondriac, and was prone to exaggeration. The mere fact that Dr. Grimes referred him to a cardiologist out of an abundance of caution is not sufficient reason to reverse the decision by the trier of fact.

The *Warner* v. *Liebhaver* case involved a woman who sought $100,000 for personal injuries and $1,500 for property damage resulting from an automobile accident. She had $12,285 in medical expenses. The jury awarded her total damages of $2,500, and the trial judge denied her motion for a new trial. Analyzing the record, we held that the jury could reasonably have found that Mrs. Warner was not seriously injured and that her medical expenses were not fairly attributable to whatever back pain she may have suffered. One of her doctors testified that, although she had undergone surgery three months before the accident, her problem was primarily psychological. A treating psychiatrist indicated that the accident had become the focus for her existing emotional conflicts. Under the circumstances, we held that there was no abuse of discretion.

In *Smith* v. *Pettit, supra,* the appellant claimed damages for permanent injuries to his neck and back, loss of earnings and earning capacity, past and future pain and suffering, and past and future medical expenses, which he asserted, were the consequences of an automobile wreck. The jury awarded him only $1,711.64, the amount of his medical bills. Reviewing the evidence, we observed that Smith has missed no work because of the accident; he had been involved in three other automobile collisions; he had previously fallen off a telephone pole; he suffered from stress associated with a new employment situation;

and his condition continued to improve. On the basis of these and other factors, we held that there was no abuse of discretion in the trial court's denial of a new trial.

In *Kratzke* v. *Nestle-Beich, Inc., supra,* a 1991 case, medical expenses of $47,060.12 were claimed, and the jury's verdict was $2,000. Citing *Warner,* we concluded that the jury could have decided that medical expenses were attributable to preexisting causes and not to an automobile accident. We said: "The mere fact that medical expenses have been incurred by the appellant and the additional fact that the appellee has admitted liability do not automatically translate into a damage award equivalent to those expenses." 307 Ark. at 160, 817 S.W.2d at 890.

In the present case, the trial judge sitting as the trier of fact was the sole judge of the credibility of the witnesses and of the weight to give their testimony. *See Takeya* v. *Didion,* 294 Ark. 611, 745 S.W.2d 614 (1988). The majority, by its decision, has insinuated itself into that role for the purpose of obtaining a desired result. The consequence of this decision is to lend instability to an area of the law that cries for stability.

I would pay heed to our past decisions and affirm the judgment of the trial judge.

HAYS, J., joins.