
# SUPREME COURT OF ARKANSAS

No. CV–12–1048

|  |  |
|---|---|
| DEBORAH NOWICKI, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF ROBERT HENRY NOWICKI, II, DECEASED, AND ON BEHALF OF ALL WRONGFUL DEATH BENEFICIARIES OF ROBERT HENRY NOWICKI, II APPELLANT | **Opinion Delivered** December 5, 2013 <br><br> APPEAL FROM THE CRITTENDEN COUNTY CIRCUIT COURT [NO. CV-11-514] <br><br> HONORABLE VICTOR L. HILL, JUDGE |
| V. |  |
| KENNY PIGUE d/b/a K & D GRAIN TRANSPORT, TEEL MARKETING SERVICES, INC., RICK ELLIS, DIANE ELLIS, and ELLIS TRANSPORTS, LLC APPELLEES | <u>AFFIRMED</u>. |

**JOSEPHINE LINKER HART, Associate Justice**

Appellant, Deborah Nowicki ("Nowicki"), individually and as executrix of the estate of Robert Henry Nowicki, II, deceased, and on behalf of all of the deceased's wrongful-death beneficiaries, appeals from the order of the Pulaski County Circuit Court granting summary judgment in favor of appellee Kenny Pigue. On appeal, Nowicki contends that the circuit court erroneously concluded that the Fireman's Rule barred the wrongful-death and survival action. Particularly, Nowicki asserts that the doctrine does not apply to roadside-assistance workers. Further, Nowicki contends that the doctrine does not apply when there is willful and wanton misconduct, and that, at a minimum, a question of fact exists regarding whether Pigue's conduct was willful and wanton. We affirm the circuit court's decision.

SLIP OPINION

Summary judgment may be granted when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *LVNV Funding, LLC v. Nardi*, 2012 Ark. 460, at 2. On appeal, this court determines if summary judgment was appropriate based on whether the evidentiary items presented by the moving party have left a material question of fact unanswered. *Id*. We view the evidence in the light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id*. This court reviews questions of law de novo. *Corn v. Farmers Ins. Co.*, 2013 Ark. 444, at 2, ___ S.W.3d ___, ___.

Before considering Nowicki's points on appeal, we note that no Arkansas cases have examined the Fireman's Rule, also known as the Firefighter's Rule or the professional-rescuer's doctrine (the "doctrine"), since its adoption in *Waggoner v. Troutman Oil Co.*, 320 Ark. 56, 894 S.W.2d 913 (1995). In *Waggoner*, this court described the rule as providing that "a professional firefighter may not recover damages from a private party for injuries the fireman sustained during the course of putting out a fire even though the private party's negligence may have caused the fire and injury." *Id*. at 58, 894 S.W.2d at 914.

In that case, Ben Waggoner, a volunteer fireman, left his business and ran to an accident in which a person driving a pick-up truck had struck an above-ground kerosene storage tank. *Id*. at 57, 894 S.W.2d at 914. After Waggoner saw flames rising from underneath the truck and fluid leaking from the tank, he assisted arriving firemen in an effort to extinguish the fire. *Id*. at 58, 894 S.W.2d at 914. He ran from the fire after hearing percolating noises coming from the tank, but the tank exploded, causing third-degree burns across the back of

his body. *Id.*, 894 S.W.2d at 914.

Waggoner subsequently brought suit against the driver of the pick-up truck and others. The trial court granted summary judgment to the driver, and Waggoner appealed. On appeal, this court adopted the doctrine based on public-policy considerations, following those cases where courts had concluded that "the risk is one which the fireman has engaged to encounter by virtue of his employment and one which it is his duty to accept, and the person who negligently causes the fire had therefore not breached a duty owed the fireman." *Id.* at 59, 894 S.W.2d at 915. This court held that the doctrine barred "recovery for the very valid public policy reason that the party or parties who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter was employed to confront." *Id.* at 60, 894 S.W.2d at 915.

We now consider Nowicki's argument. The gravamen of Nowicki's last amended complaint is a wrongful-death and survival claim. The complaint alleges that on June 20, 2011, Pigue, doing business as K & D Grain Transport, was southbound on Interstate 55 in Arkansas heading toward the Mississippi River bridge in an eighteen-wheel tractor-trailer containing a load of grain weighing 84,820 pounds. The complaint alleged that the fuel return system was not operating properly on the truck, that the truck should have been loaded with only 80,000 pounds, that Pigue failed to properly measure the truck's fuel supply or properly calculate the fuel requirements for his planned trip with that size load, and that Pigue failed to stop and refuel even though his fuel gauge indicated that the truck was empty.

The complaint further alleged that Pigue failed to recognize that his engine was losing

SLIP OPINION

power and was suffering from fuel exhaustion, requiring him to immediately get off the roadway and out of traffic lanes, and the truck stalled from fuel starvation while in the left traffic lane on Interstate 55. The complaint also alleged that Pigue did not place warning markers or reflectors an adequate distance behind his stalled truck to warn oncoming traffic.

The complaint further alleged that the decedent was working as a Tennessee Department of Transportation ("TDOT") HELP program operator and was driving his truck to assist another driver who was stalled on the Mississippi River bridge. The decedent entered Interstate 55 southbound at the last entrance ramp before the bridge. He saw Pigue and pulled alongside and asked Pigue if he needed help. Pigue replied that he did. The complaint alleged further that because of traffic, the decedent was unable to pull in behind the truck, so he pulled in front of the truck and parked there with his emergency lights and sign flashing "in accordance with his training." The decedent then assisted Pigue in an attempt to restart the engine. The complaint alleged that after Nowicki arrived, Pigue failed to call 911 to assist with traffic or contact all approaching truckers and alert them.

The complaint further alleged that meanwhile, a fully loaded truck owned by Ellis Transports, LLC, was traveling southbound on Interstate 55. This truck approached Pigue's stalled truck from behind and in the same lane. The complaint alleged that the driver was "unable to avoid the Pigue truck and hit it from the rear." The decedent died in the collision. According to the complaint, Pigue admitted to a law enforcement official who arrived at the accident scene that he had run out of fuel, and that other witnesses observed that the fuel level in the fuel tank was below the fuel pick-up tubes.

SLIP OPINION

Pigue answered that the doctrine was a "complete bar" to Nowicki's claim and moved for summary judgment on that basis. In response to the motion, Nowicki argued that the decedent was not a professional rescuer and that the doctrine should not be extended to roadside-assistance workers. Further, Nowicki argued that because Pigue's conduct was willful or wanton and reckless, the doctrine should not apply.

The circuit court granted summary judgment in favor of Pigue. The court stated that the doctrine precludes a professional rescuer from "recovering for injuries inherent in and unique to the types of dangers generally associated with that particular rescue activity." The court opined that the doctrine applied "to any publicly paid employee whose job carries with it a certain kind of danger and that worker falls victim to that danger." The court concluded that the decedent was a roadside-assistance worker, a publicly paid position, and that "position placed him on the shoulder of the [i]nterstate where he might well fall victim to a variety of mishaps," including the "very harm that tragically ended his life." The court further found that although Nowicki "argues that there are exceptions to the rule, the court fails to discern them in this case."

On appeal, Nowicki argues that the circuit court erred as a matter of law in "expand[ing]" the doctrine to roadside-assistance workers. Nowicki asserts that the doctrine is suspect, given that state appellate courts have not agreed on the legal basis for the doctrine and have created exceptions to the doctrine, and that expanding the doctrine to roadside-assistance workers is inconsistent with the "trend" to abolish or limit the doctrine. Nowicki states that she is not asking that this court abrogate the doctrine. Nowicki contends, however,

that extension of the policy to roadside-assistance workers is not consistent with the doctrine. Nowicki asserts that while roadside-assistance workers are peripherally exposed to dangers when answering calls for assistance, their job is to clear the highways to prevent traffic congestion, and their exposure to danger is collateral to that job.

In *Waggoner*, this court considered several legal theories that might underlie the doctrine and concluded that there were public-policy considerations that supported the doctrine. Thus, we decline to reconsider our holding in *Waggoner* that the risk a firefighter undertakes is a part of employment as a firefighter and a risk that is the firefighter's duty to accept, and that recovery cannot be had for the public-policy reason that the party who negligently started the fire had no legal duty to protect the firefighter from the very danger that the firefighter was employed to confront. We read *Waggoner* consistently with the assertion that the doctrine "prohibits recovery by a professional risk-taker for injuries from the negligently created risk that was the very reason for his presence on the scene." Dan B. Dobbs, *The Law of Torts* § 364 (2011) (internal quotation omitted). Thus, in applying *Waggoner*, the question is whether the deceased, in his capacity as a TDOT HELP program operator, was precluded from recovering damages because he was undertaking a risk that as part of his employment was his duty to accept. In considering this issue we decline to apply a "categorical rule" but rather evaluate "the facts bearing on whether the worker was paid to assume the risk in question." Dobbs, *supra*, § 365.

In support of the summary-judgment motion, Pigue presented the TDOT HELP program policy and procedures manual. In part, the manual provided that the TDOT HELP

program "is a coordinated effort by the Tennessee Department of Transportation and other agencies and jurisdictions to enhance the traffic flow on urban interstates and freeways in order to maximize the operation of the highway network." The manual noted that "[t]raffic delays caused by minor accidents, stalled vehicles and other lane closing situations can cause secondary accidents which lead to other injuries or fatalities and reduce the ability of response agencies to answer other emergency calls." The manual provided that the HELP program "can help prevent further loss of life and property by helping to minimize the impact of freeway incidents on the flow of traffic through the urban areas."

The manual further noted that the purpose of the program "is to provide efficient response to highway incidents that impede traffic flow along the urban freeways in the State's larger urban areas," and that its "function is to assist highway incident response agencies and the motoring public in keeping traffic moving and to clear the road." The manual provided that the scope of highway accident or incident response included providing "fuel or other vehicle fluids needed by stranded motorists," as well as "[p]lacement of on board traffic control devices around incident or accident that cannot be moved from traffic lane," and "[d]irect[ing] traffic at incident scenes to increase traffic capacity."

The manual further stated as follows:

Incident management is defined as a planned, coordinated Program to detect and remove incidents and restore traffic capacity safely and quickly. In many situations, the HELP Program Operator will be the first responder to a highway incident. In that case, the operator will immediately assess the incident location and incident environment to determine what agencies should be dispatched to the site. When the incident is in one or more travel lanes, the operator should arrange the HELP Program

vehicle to protect the individuals involved in the incident, keeping in mind the most efficient method of traffic flow to minimize congestion. Unless the incident involves injured persons or hazardous materials, the operator should attempt to relocate the vehicles or debris out of the travel lanes.

The manual listed as one of the levels of incidents to which the HELP operator would respond to as "Level 2: Roadway Assist for lane blocking incidents: incidents of short duration . . . which occupy the travel lanes up to approximately one hour." The manual noted that the HELP unit would "respond to Level 1 and Level 2 incidents using the truck-mounted lights and arrow boards and 28-inch channelizing cones." Also included in the exhibits were documents showing a memorandum of understanding between the Arkansas State Highway and Transportation Department, the Arkansas State Police, and TDOT emphasizing the "URGENT AND SAFE CLEARANCE of highway incidents."

After considering these evidentiary items provided in support of Pigue's motion for summary judgment, and viewing the evidence in the light most favorable to Nowicki and resolving all doubts and inferences against Pigue, we hold that, consistently with *Waggoner*, the risk the decedent undertook was a part of employment as a TDOT HELP program operator and a risk that is a TDOT HELP program operator's duty to accept, and that recovery cannot be had for the public-policy reason that Pigue had no legal duty to protect the TDOT HELP program operator from the very danger that the TDOT HELP program operator was employed to confront. As can be seen from the manual, these TDOT HELP program operators were envisioned as being first responders on urban freeways in larger urban areas who had a duty to assist and protect motorists, including those who had run out of fuel.

In an instance where a traveling lane was blocked, the operator's duty was to address problems associated with the flow of traffic around the blocked lane, including warning oncoming motorists of the blocked lane and removing the stalled vehicle from the lane. The traffic duties of a TDOT HELP program operator required the decedent to be present to assist both the motorist and others in the risk that was the very reason for his presence on the scene. Accordingly, we hold that the doctrine barred Nowicki's claims against Pigue.[1]

Nowicki further argues that the doctrine should not apply here because Pigue's conduct was willful and wanton, and that, at a minimum, a question of fact exists as to the whether Pigue's conduct was willful and wanton. Nowicki contends that there is no rational basis for immunizing those who act willfully and wantonly in creating a danger to public workers.

Here, the circuit court found that although Nowicki argued that there are exceptions to the rule, it failed to discern them in this case. The purpose of summary judgment is not to try the issues but to determine whether there are any issues to be tried. *BPS, Inc. v. Parker*, 345 Ark. 381, 388, 47 S.W.3d 858, 864 (2001). To constitute willful or wanton conduct, this court has stated that there must be a deliberate intention to harm or an utter indifference to, or conscious disregard of, the safety of others. *Shepherd v. Washington Cnty.*, 331 Ark. 480, 506, 962 S.W.2d 779, 791 (1998).

---

[1]Nowicki relies on *Catlett v. Stewart*, 304 Ark. 637, 804 S.W.2d 699 (1991), arguing that because this court declined to apply the doctrine to a constable, we should not apply it to a TDOT HELP program operator. The case is inapposite because even though the injured person was a constable, he was not acting as a constable.

In Nowicki's brief, she alleges that there is a question of fact as to whether Pigue's conduct was willful or wanton, arguing that Pigue chose to operate his truck low on fuel for a considerable time, passing numerous refueling stations, while knowing that his breakdown could create a traffic hazard. However, even viewing the evidence in the light most favorable to Nowicki and resolving all doubts and inferences against Pigue, we cannot say that a genuine issue of material fact exists as to whether this conduct—running out of fuel—constituted a deliberate intention to harm or an utter indifference to, or conscious disregard of, the safety of others. *See Nat'l Bank of Commerce v. McNeill Trucking Co.*, 309 Ark. 80, 88, 828 S.W.2d 584, 588 (1992) (Dudley, J., concurring) (collecting cases); *Dixon v. Weaver*, 255 S.E.2d 322 (N.C. Ct. App. 1979) (holding that the court did not err in refusing to submit issue of willful and wanton misconduct where defendant should have known that she was going to run out of gasoline on an interstate highway; that knowing this condition, she continued to drive in the left lane rather than in the right lane; that she abandoned her car in the left lane, blocking the highway; that she did not flag or warn other drivers that there was danger ahead although there were others in her car who could have done so). Accordingly, we need not consider whether willful or wanton misconduct creates an exception to the doctrine.

Affirmed.

HANNAH, C.J., and DANIELSON, J., dissent.

**PAUL E. DANIELSON, Justice, dissenting.** The Fireman's Rule, which is also

known as the professional-rescuers doctrine, generally provides that a professional firefighter may not recover damages from a private party for injuries the fireman sustained during the course of putting out a fire even though the private party's negligence may have caused the fire and injury. *See Waggoner v. Troutman Oil Co.*, 320 Ark. 56, 894 S.W.2d 913 (1995). The doctrine was adopted by this court in *Waggoner*, wherein this court stated its persuasion by those courts' decisions that justified the Rule on considerations of public policy.[1] *See id.*

In the cases found persuasive by this court, we found "that the risk is one which the fireman has engaged to encounter by virtue of his employment and one which it is his duty to accept, and the person who negligently causes the fire has therefore not breached a duty owed the fireman." *Id.* at 59, 894 S.W.2d at 915 (citing *Buchanan v. Prickett & Son, Inc.*, 279 N.W.2d 855 (Neb. 1979)). This court further quoted with approval the rational reasoning of the Supreme Court of Hawaii:

> The very purpose of the firefighting profession is to confront danger. Firefighters are hired, trained, and compensated to deal with dangerous situations that are often caused by negligent conduct or acts. [I]t offends public policy to say that a citizen invites private liability merely because he happens to created a need for those public services.

*Id.* at 59–60, 894 S.W.2d at 915 (quoting *Thomas v. Pang*, 811 P.2d 821, 825 (Haw. 1991)).

According to the TDOT's HELP Program Policy and Procedures Manual made a part of the record in the instant case,

---

[1]As the majority correctly notes, the doctrine itself has already been adopted by this court; whether to retain the doctrine is in no way before this court. Neither party asks this court to abolish the doctrine, and this court is bound to follow prior case law under the doctrine of stare decisis, a policy designed to lend predictability and stability to the law. *See Davis v. Parham*, 362 Ark. 352, 208 S.W.3d 162 (2005).

SLIP OPINION

[t]he purpose of the Tennessee HELP Program is to provide efficient response to highway incidents that impede traffic flow along the urban freeways in the State's larger urban areas. The HELP Program's function is to assist highway incident response agencies and the motoring public in keeping traffic moving and to clear the road.

Tennessee Department of Transportation HELP Program Policy & Procedures Manual, 4 (Dec. 15, 2000). The Manual further sets forth the scope of responses to highway accidents or incidents:

a. Provide fuel or other vehicle fluids need by stranded motorists
b. Provide air for tires or assist in tire changing
c. Provide minor repair items needed by stranded motorists
d. Contact towing company or other party for assistance to motorist
e. Contact appropriate law enforcement, fire or Emergency Medical Technicians (EMT) officials as warranted
f. Placement of on board traffic control devices around incident or accident that cannot be moved from traffic lane
g. Respond to on-site requests for assistance from law enforcement, fire, EMT and other transportation officials
h. Direct traffic at incident scenes to increase traffic capacity
i. Remove minor debris from roadway.

*Id.* Considering the duties outlined above, I simply cannot say that the "very purpose" of Mr. Nowicki's profession as a HELP worker was "to confront danger." *Waggoner*, 320 Ark. at 59, 894 S.W.2d at 915 (quoting *Thomas*, 811 P.2d at 825).

While there is undoubtedly some risk associated with assisting motorists on the interstates of this country, it would be fair to say that the risk is not as great as that faced by firefighters on each call. Unlike firefighters, the very nature of a HELP worker's duties does not require him to face imminent danger a majority of the time; instead, HELP workers "are only peripherally involved in such hazards." *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708,

713 (Mo. 1990). Because it is my opinion that the purpose of Mr. Nowicki's occupation as a HELP worker was not to confront danger, I would reverse the circuit court's grant of summary judgment and remand the matter to the circuit court.

For the foregoing reasons, I respectfully dissent.

HANNAH, C.J., joins.

*James E. Girards*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellant.

*Deacon Law Firm, P.A.*, by: *J. Barrett Deacon* and *Lauren O. Baber*, for appellee.